**James H. FRIEND, Silas Trowell and Floyd Long, Appellants,**

v.

**TROPIS COMPANY, Ltd., Appellee.**

**No. 11230.**

United States Court of Appeals
Fourth Circuit.

Argued June 23, 1967.

Decided Sept. 11, 1967.

Sidney H. Kelsey, Norfolk, Va. (Kelsey & Rabinowitz, Norfolk, Va., on brief), for appellants.

John W. Winston, Norfolk, Va. (Seawell, McCoy, Winston & Dalton, Norfolk, Va., on brief), for appellee.

Before SOBELOFF, BOREMAN and BRYAN, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

For personal injuries suffered by them while working in the hold of the Greek freighter, SS AVRA, discharging cargo at Norfolk, Virginia, longshoremen Trowell, Friend and Long brought this action at law for damages against her owner, Tropis Company, Ltd. On both assertions of liability—negligence and unseaworthiness of the vessel—the jury found for the defendant. From the judgment of the District Court entered on this verdict, the plaintiffs appeal: (1) for the refusal of the Court to direct a finding of liability for unseaworthiness, and (2) for misdirection upon this alleged liability. The motion was correctly overruled, and we conclude, too, there was no reversible error in the instruction.

The injuries, concededly, resulted from electric shocks suffered while these men were trimming a cargo of bulk potash for unloading. "Grabs"—clam shell buckets on a hoist—were let down into the hold through the hatchway for removal of the lading. As they "grabbed" it, the longshoremen would fill the hole dug by the grabs so that they could pick up a

full load on return. The potash ran like sand, and the workers slid with it towards the excavation. To stay their slide they would reach for a stanchion or beam. On the occasion in suit, just as they were about to touch a metal piece of this kind, the longshoremen felt an electric shock and were hurt.

As electricity indubitably was the cause of their injuries, the next question was its source. Plaintiffs blamed it on defective wiring. In denial, the defendant ascribed it to static electricity generated on the bodies and clothes of the claimants by friction with the potash. That such activity could create a charge was demonstrated in producing an electric arc by holding a metal shovel scoop a fraction of an inch from the stanchion or beam just after passing it through the potash. No further arcing could be obtained until the shovel again had been put in abrasive contact with the potash and held near the metal strut. A small shock was felt when one walking over the cargo touched the steel ladder leading to the deck above. Expert testimony declared this phenomenon accountable for the electricity in the hold. At the same time, qualified witnesses gave evidence to the safety and good order of the electric system aboard ship.

The accident occurred in Number 2 hold about 2 o'clock in the afternoon of November 1, 1963. Having worked the hold continuously since 8 o'clock that morning without mishap, plaintiffs turned to again at 1 p. m. after a lunch break. An hour later they sustained the shocks. Work in that hold was immediately suspended, with off-loading of similar cargo shifted to another hold without event or mishap. In the morning the temperature at 8 o'clock had been 55 degrees and the relative humidity 57 percent. From then on the temperature increased and the humidity declined until 2 p. m. the Weather Bureau reading showed 71 degrees and 36 percent.

It was authentically testified that relative humidity within the range of 30 to 40 percent will foster the accumulation of electric charges. Damp air, it is said, harmlessly conducts the charge off to ground it as it is formed; dry air is an insulator, favoring the accretion of substantial charges. No such static electricity, according to the testimony, had ever been encountered in a ship's hold at or near Norfolk in the memory of watermen witnesses, a retrospect of some 25 years. Furthermore, we are told without contradiction that no practical means to prevent the creation of static in the circumstances is known.

Notwithstanding, the plaintiffs urge, electricity free in the hold rendered the ship unseaworthy, denying the longshoremen a safe place to work as assured by the doctrine of seaworthiness. Their argument is that the cause of the presence of this injurious element is immaterial—that the defendant is responsible for the electricity in the hold whether it escaped through defective wiring or was generated from the men's friction with the cargo. On this reasoning the plaintiffs moved for a peremptory instruction to the jury to find unseaworthiness. Refusing the requested direction, the Court charged that the defendant was liable if the electricity came from defective wiring, but that there was no responsibility "if the shock was caused solely by static electricity."

■■ Denial of the motion was altogether proper; it would have foreclosed the ship's defense on the issue of responsibility for the static electricity. The instruction, true, evinced the idea that static electricity does not in law render a vessel unseaworthy; this could possibly be too broad an immunization of the ship. However, the Court may have intended merely to withdraw the issue from the jury for inadequate evidence. In any event, we think it should have been taken away for the latter reason, and the withdrawal for any other reason was not hurtful to the plaintiffs.

■ Proof that electricity was at large in the hold established unseaworthiness prima facie and, without more, warranted the jury to make that finding. But the defendant was entitled to contest

the plaintiffs' showing, as it did. Thereafter the issue became a question to be resolved by the jury on the evidence and under instructions defining unseaworthiness. According as the jury found there was or was not a wiring defect releasing the electricity, of course liability would or would not be imputable to the defendant on that score. But static electricity could not be excluded as nonactionable as a matter of law. The jury would have been allowed to speak on liability based upon static electricity if there had been evidence enough to allow it to ponder the question.

■ As the present verdict was for the defendant, the jury obviously found no causal defect in the electric system. While the Court's charge was phrased as an unqualified holding that static electricity could not be a predicate of recovery, it was also, in effect, a declaration to the jury that the evidence would not justify a verdict on that basis. Therefore, we are not required to say whether static electricity on a ship does or does not constitute unseaworthiness. Hence we turn at once to evaluate the proof instantly offered to establish an unseaworthiness resulting from static electricity.

To begin with, the plaintiffs adduced no evidence whatsoever to prove the loose electricity the product of a static charge. Indeed, the argument of the plaintiffs in the trial court, as well as on appeal, blamed a defect in the ship's wiring for introduction of electricity in the hold. Static electricity came into the case through the defendant's explanation of the entry of this foreign factor. However, the plaintiffs were not precluded from relying on this evidence, and we thus come to the inquiry whether this electricity breached the ship's warranty of seaworthiness to the longshoremen. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

■ The warranty, as pertinent here, was that the ship was reasonably fit to permit the plaintiffs to perform with reasonable safety the tasks assigned to them. Reasonable care to keep the ship in a reasonably fit condition is not enough, although it would require a charge of negligence. Seaworthiness demands reasonable safety unconditionally. But "the owner is [not] obligated to furnish an accident-free ship. * * * The standard is not perfection, but reasonable fitness * * * a vessel reasonably suitable for her intended service." Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960).

■ In measuring the present case by these standards, it is clear that the static electricity did not, on the proof, make the AVRA unseaworthy. The electric charge no more emanated from the ship, her gear or equipment than from the men themselves. The causative factor here was the entry into the hold of relatively drier air with its insulating properties. The potential for harm arose not because electricity was generated but because the air would not bleed it off to ground. This was a natural condition of the natural atmosphere. The happening of the injurious discharge, when the men touched a willing conductor, was no more controllable by the ship than was a stroke of lightning, and just as unforeseeable.

Apposite here are the decision and following words of the Court in Morales v. City of Galveston, 370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed.2d 412 (1962):

"The trial court found, upon substantial evidence, that what happened was an unexpected, isolated occurrence. * * *" (p. 169, 82 S.Ct. at p. 1229.)

* * *

"What caused injury in the present case, however, was not the ship, its appurtenances, or its crew, but the isolated and completely unforeseeable introduction of a noxious agent from without. * * *" (p. 171, 82 S.Ct. at p. 1230.)

There the claimants "were injured by fumes from the chemical, made noxious by concentration in the closely confined area [the hold] where they were working" as trimmers of a cargo of grain.

The owner was acquitted of the indictment of unseaworthiness. For like reasons we see no liability upon the owner in the case at bar.

Affirmed.