Michael T. EARLES, Appellee,

v.

UNION BARGE LINE CORPO-
RATION, Appellant,

Billy Leroy McNAMER, Appellee,

v.

UNION BARGE LINE CORPO-
RATION, Appellant.

Nos. 72–1313, 72–1314.

United States Court of Appeals,
Third Circuit.

Submitted Feb. 12, 1973.

Decided May 23, 1973.

As Amended Aug. 9, 1973.

See also, D.C., 321 F.Supp. 1329.

Harry Alan Sherman, Pittsburgh, Pa., for appellees.

Bruce R. Martin, Pittsburgh, Pa., for appellant.

Before VAN DUSEN and ADAMS, Circuit Judges, and BRODERICK, District Judge.

## OPINION OF THE COURT

BRODERICK, District Judge.

This is an appeal from a judgment entered on May 4, 1971 in the United States District Court for the Western District of Pennsylvania after a jury returned a verdict based on unseaworthiness in favor of the plaintiffs.

The pertinent facts are that the plaintiffs, Michael T. Earles and Billy Leroy McNamer, were citizens of Kentucky and were employed on May 8, 1967, the date of their injuries, by the Walker Boat Yard, Inc. (hereinafter referred to as Walker) located in Paducah, Kentucky. Walker, among other things, serviced, stored and cleaned barges for companies which did business along the Ohio River. Plaintiff Earles had been employed full time by Walker for approximately one month prior to May 8, 1967 as a maintenance man to perform miscellaneous harbor work, such as moving and cleaning barges. His job requirements consisted in knowing how to push a broom

or to use a hose, and his duties involved mainly work aboard either grain or salt barges which were either open or had roll-type covers on them. Plaintiff Mc-Namer had worked for Walker for approximately eight months prior to the incident of May 8, 1967, and his duties included helping to clean open and roll-type barges containing salt and other freight, helping to stack covers, and helping as a deck hand aboard one of Walker's boats. Neither Earles' nor McNamer's duties prior to May 8, 1967 had included working inside of a chemical barge. Prior to May 8, 1967, the records of UBL (Union Barge Line) 903 show that this barge had been loaded with toluene [1] at Houston on April 5, 1967, had been discharged of that chemical on April 28, 1967, and was delivered empty to Walker on the morning of May 6, 1967.[2] Walker had been engaged by the defendant Union Barge Line Corporation (hereinafter referred to as Union Barge), a citizen of Pennsylvania, to perform a "contract to strip the barge of old cargo, cold water wash it, and and [sic] pump it clean." [3] For this purpose, UBL–903 was in the possession and control of Walker from May 6 to May 10, 1967. In the course of their duties on May 8, 1967, plaintiffs were instructed to go over and clean up a barge. Plaintiffs, and another Walker employee

named Jimmy Woodford, were supplied with a flat, two pumps, some dip buckets and a fire hose and nozzle. The three men were taken by Walker's harbor boat, which towed a crane barge and the flat, out to Owens Island where UBL–903 was tied up. Owens Island is situated approximately a mile and a half from Walker's at the junction of the Ohio and Tennessee Rivers. Walker had a fleet of barges tied off Owens Island, and first two other barges had to be repositioned in order to gain access to UBL–903. The plaintiffs and Mr. Woodford then tied their flat to UBL–903 and boarded it with their equipment. UBL–903 was approximately 195 feet long, 35 feet wide and 11 feet deep and contained six chemical tanks, three tanks along each side. All of the hatch covers to these tanks were open when the three men arrived at the barge; there was no sign of any kind on the barge. The method of cleaning the tanks of old cargo consisted of having one man enter a tank through the hatch, descend a metal ladder approximately eleven feet long which was attached to the side of the tank, hose the sides and floor of the tank with water pumped from the Ohio, pump back out the wash water, dip the balance of the wash water out with a bucket after the pump had lost its prime, and then exit the tank. After the three

1. "Toluene is a vital or 'critical' material in wartime, because TNT, trinitrotoluene . . . is undoubtedly the principal explosive in modern warfare. Toluene is used extensively as a solvent in the rubber, lacquer, and munition industries. It is poisonous when inhaled." A. Lowy & B. Harrow, An Introduction to Organic Chemistry, 242–43 (7th Ed. 1954).

2. Defendant's Exhibit A, an extract from the barge record of Union Barge Line (UBL)–903, provides in pertinent part that:

 UBL–903 departed Shell Oil at Houston loaded with toluene via DIXI Carriers on 4/5/67 at 2305 and was delivered to Baton Rouge 4/13/67 at 1530.

 Picked up by Towboat MARINER at Baton Rouge on 4/16/67 at 1000 and elivered [sic] to Walkers fleet, Paducah, Kentucky, via tug THUNDERBIRD on 4/21/67 at 0910.

 Picked up at Walkers by Igert, Inc. on 4/23/67 at 0945 and delivered to TYNER for discharge on 4/28/67 at 1345.

 Empty Barge UBL–903 picked up at Tyner by Igert, Inc. on 5/2/67 at 2300 and delivered to Walkers, Paducah on 5/6/67 AM.

 Barge was to be stripped and cold water washed.

 Picked up by Igert, Inc. on 5/10/67 PM and delivered to Calvert City 5/10/67 at 1900.

 N.T. 118–19.

3. N.T. 116–17. The trial transcript does not reveal any evidence as to the knowledge of either Walker or Union Barge concerning the presence of poisonous fumes in the tanks of UBL–903.

men had taken turns in entering some of the tanks and doing the cleaning, their foreman Everett Livingston returned, looked in the tanks and told them to "[r]inse it down and then go down and dip the sump wells in the bottom, and we will be back to get you." One man would be in a tank for a total time of approximately twenty minutes, and there was a delay of approximately twenty minutes from the time one tank was finished being cleaned and the time they began to clean the next tank, which time was used to reposition the flat and equipment. After cleaning several tanks in this fashion, plaintiff Earles entered a tank to do the hosing, and Jimmy Woodford followed into the tank behind Earles to feed him the fire hose. Immediately after Earles and Woodford went into the tank, they breathed the poisonous fumes from the old cargo in that tank. Within twenty to thirty seconds after entering, they were overcome by the fumes, lost conciousness and fell on the floor of the tank with Earles' body lying in a puddle of the old chemical cargo. Plaintiff McNamer entered the tank to find out why the men were acting strangely, tried to rescue them and breathed the poisonous fumes. McNamer, however, was able to reach the ladder, climb out of the tank and flag down a passing boat before he, too, was overcome. Plaintiffs were treated for toluene exposure at a local hospital. They subse-quently filed separate suits for their personal injuries, which suits were consolidated for the purposes of trial. Following a jury trial based upon diversity of citizenship on the issue of unseaworthiness of the vessel, verdicts were awarded each plaintiff and judgments entered in the amounts of $7,000.00 for plaintiff Earles and $5,500.00 for plaintiff McNamer. Union Barge now presents this appeal claiming that, as a matter of law, the evidence in the case does not support a finding of unseaworthiness on the ground that a shipowner's warranty of seaworthiness does not include the obligation to furnish a reasonably safe place for a seaman to perform his chores.

 In maritime law, the locality of the tort traditionally governs the scope of maritime jurisdiction. While state law governs torts occurring on land,[4] and piers and docks are extensions of this land,[5] the gang plank serves generally as the dividing mark with maritime law being applied to those torts which occur on navigable waters,[6] when the wrong bears a significant relationship to traditional maritime activity,[7] or which occur on land but are caused by a ship on navigable water.[8] Navigable waters are those waters in the United States which afford a channel for useful commerce.[9] The Ohio River, used daily for the transportation to market of various products of this country, is a navigable water, and, therefore, mari-

4. State Industrial Comm'n. v. Nordenholt Corp., 259 U.S. 263, 42 S.Ct. 473, 66 L.Ed. 933 (1922).

5. Nacirema Operating Co. v. Johnson, 396 U.S. 212, 214–215, 90 S.Ct. 347, 349–350, 24 L.Ed.2d 371 (1969).

6. Victory Carriers, Inc. v. Law, 404 U.S. 202, 205 & n. 2, 92 S.Ct. 418, 421 & n. 2, 30 L.Ed.2d 383 (1971).

7. Executive Jet Aviation, Inc. v. City of Cleveland, Ohio, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972) (Absent legislation to the contrary, there is no federal admiralty jurisdiction over aviation tort claims arising from flights on land-based aircraft between points within the continental United States even though an airplane crashed into the navigable waters of Lake Erie, since the wrong bears no relationship to traditional forms of maritime commerce and navigation.

8. The Extension of Admiralty Jurisdiction Act, 46 U.S.C. § 740 provides that:
 The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.
 This Act was applied by the United States Supreme Court in Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963).

9. The Montello, 87 U.S. 430, 20 Wall. 430, 22 L.Ed. 391 (1874).

time law governs a tort which occurs on the Ohio River. Maritime law, additionally, reaches "[e]very species of tort, however occurring, and whether on board a vessel or not, if upon the high seas or navigable waters. . . ."[10] In the instant case, not only were plaintiffs injured upon navigable waters, they were injured while aboard a barge resting on a navigable water. A vessel has been defined to include "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water."[11] A barge, although without motive power, has been held to be a vessel within admiralty jurisdiction[12] and within the meaning of the Longshoremen's and Harbor Workers' Compensation Act[13] since it is a means of transportation by water.[14] Therefore, maritime law governs the accident which plaintiffs suffered while aboard the barge on the Ohio River.

The defendant barge owner takes the position that the barge was not unseaworthy[15] and that this Court should so determine this as a matter of law. Defendant contends that the poisonous gas in the tank of the barge is a concomitant of chemical cargoes and that the very purpose of this tank barge was to carry such chemical cargoes.

■ A review of the history of the present day doctrine of the warranty of seaworthiness owed by a vessel or its owner to a seaman, or other person doing work on board the vessel of a type which traditionally was performed by a seaman, has been adequately set forth in other opinions.[16] In brief, early cases

10. Atlantic Transport Co. v. Imbrovek, 234 U.S. 52, 60, 34 S.Ct. 733, 734, 58 L.Ed. 1208 (1914).

11. 1 U.S.C. § 3.

12. The Dick Keys, 7 Fed.Cas. p. 678 (No. 3,898) (C.C.S.D.Ohio 1863).

13. 33 U.S.C.A. § 901 et seq. The Longshoremen's Act is the Congressional provision for industrial accident coverage applicable to maritime employees who could not, under Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917), be covered by State Workmen's compensation statutes. The Act applies to all injuries and deaths "occurring upon the navigable waters of the United States, (including any dry dock)." 33 U.S.C.A. § 903(a).

14. Norton v. Warner Co., 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 931 (1944).

15. Union Barge has not argued, either in the Court below or in this appeal, that appellees were not performing the traditional work of seamen when they fell victims to the poisonous fumes. In Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), the United States Supreme Court extended the warranty of seaworthiness of the vessel to a stevedore employee of an independent contractor who was injured while working aboard the ship. The Court again applied the doctrine of unseaworthiness in Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953), when recovery againt the shipowner was permitted by a person who was injured while doing carpentry work on the grain-loading equipment aboard the ship. Since *Sierecki* and *Hawn*, the warranty of seaworthiness of a vessel has been held to encompass other harbor workers such as repairmen, Lawlor v. Socony-Vacuum Oil Co., 275 F.2d 599 (2nd Cir. 1960), cert. denied, 363 U.S. 844, 80 S.Ct. 1614, 4 L.Ed.2d 1728 (1960), and Shipcleaners, Christiansen v. United States, 192 F.2d 199 (1st Cir. 1951). "Most—perhaps all—harbor workers are seamen and thus entitled to the maritime remedies formerly restricted to the ship's company—or at least to the recovery of damages for unseaworthiness", G. Gilmore & C. Black, Jr., The Law of Admiralty, § 6–53, at 358 (1957), as long as they are performing a "service absolutely necessary to enable the ship to discharge its maritime duty." Atlantic Transport Co. v. Imbrovek, 234 U.S. 52, 62, 34 S.Ct. 733, 735, 58 L.Ed. 1208 (1914). If a person injured aboard a vessel was not performing the type of work traditionally done by the ship's crew, however, he may not recover from the shipowner for unseaworthiness of the vessel. United New York and New Jersey Sandy Hook Pilots Association v. Halecki, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959); Bryant v. National Transport Corp., 467 F. 2d 139 (3d Cir. 1972).

16. See *e. g.*, Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed. 2d 941 (1960); Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944).

in the maritime law were concerned with the concept of unseaworthiness only as it concerned the right of a mariner to sue for his wages or as it related to the rules covering maritime insurance and the carriage of goods by sea. Under shipping articles, the law implied that the captain would furnish the mariner at the commencement of a voyage with a seaworthy ship, one which was "furnished with all the necessary and customary requisites for navigation." [17] Therefore, if a ship proved unseaworthy when she entered upon the voyage, the seamen were not bound by their contract, could refuse to continue the voyage, and could compel the master to return the ship to port.[18] The test of seaworthiness in the late nineteenth century was thus stated to be "whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport." [19] In this respect, the warranty was said to be absolute and non-dependent upon either the knowledge of its owner or the diligence in providing a seaworthy vessel. The fact that a vessel was staunch and fit did not matter; the character of a ship in determining unseaworthiness was measured by reference to the particular cargo to be transported.[20] In the early twentieth century, The Osceola [21] extended the concept of unseaworthiness to apply to personal injuries sustained by a mariner on board the vessel. From that time forward until today, the case law in regard to the unseaworthiness of a vessel has blossomed from hundreds of suits into certain accepted principles of law. First of all, unseaworthiness in maritime law is a condition [22] of the vessel which proximately causes injuries to a seaman or one performing a seaman's duties. Since the liability for unseaworthiness is predicated without regard to fault or the use of due care,[23] it is irrelevant to the shipowner's liability how that condition came into being,[24] whether there was complete control over the instrumentality causing the injury,[25] or whether the shipowner had actual or constructive knowledge of the condition.[26] Unseaworthiness has been found when consumable supplies caused the injury [27] and when the ship's crew [28] or gear [29] were unfit. It applies whether the condition is temporary [30] or permanent. But, where there is no defective

17. Dixon v. The Cyrus, 7 Fed.Cas. pp. 755, 757 (No. 3,930) (D.C.D.Pa.1789).

18. The Moslem, 17 Fed.Cas. p. 894 (No. 9,875) (D.C.S.D.N.Y.1846).

19. The Silvia, 171 U.S. 462, 464, 19 S.Ct. 7, 8, 43 L.Ed. 241 (1898).

20. The Southwark, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65 (1903).

21. 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903). In *The Osceola*, the United States Supreme Court stated as the second proposition of law:
 2. That the vessel and her owner are, both by English and American law, liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship, or a failure to supply in order the proper appliances appurtenant to the ship. *Id.* at 175, 23 S.Ct. at 487.

22. Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 498, 91 S.Ct. 514, 517, 27 L.Ed.2d 562 (1971). The condition of unseaworthiness must necessarily be a relative one, dependent in each instance upon the circumstances surrounding "the things about the ship" and the purpose for which they are to be used. Walker v. Sinclair Refining Co., 320 F.2d 302, 304 (3d Cir. 1963).

23. Carlisle Packing Co. v. Sandanger, 259 U.S. 255, 42 S.Ct. 475, 66 L.Ed. 927 (1922).

24. Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 498, 91 S.Ct. 514, 517, 27 L.Ed.2d 562 (1971).

25. Alaska S.S. Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954), aff'g 205 F.2d 478 (9th Cir. 1953).

26. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 549, 80 S.Ct. 926, 933, 4 L.Ed. 2d 941 (1960).

27. Carlisle Packing Co. v. Sandanger, 259 U.S. 255, 42 S.Ct. 475, 66 L.Ed. 927 (1922).

28. Boudoin v. Lykes Brothers S.S. Co., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955).

29. Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944).

30. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed. 2d 941 (1960).

condition of the equipment, appurtenances, crew, cargo or gear of the ship, then no liability for unseaworthiness can exist.[31] The doctrine of the warranty of seaworthiness, in essence, means that "things about a ship, whether the hull, the decks, the machinery, the tools furnished, the stowage, or the cargo containers, must be reasonably fit for the purpose for which they are to be used." [32]

Since this Court is being asked by the appellant to determine as a matter of law that UBL–903 was not unseaworthy under the evidence presented in the court below, we have considered Albanese v. N. V. Nederl. Amerik Stoomv. Maats,[33] Jones v. Den Norske Amerikalinje A/S,[34] and Grigsby v. Coastal Marine Service of Texas, Inc.[35] Albanese concerned the injuries incurred by a longshoreman while he was working in the hold of defendant's vessel which contained poisonous carbon monoxide fumes. In the part of the case dealing with the claim between the longshoreman and the shipowner, which claim was unaffected by the subsequent history of the case, the Second Circuit stated that:

The jury had been instructed that the owner would be liable, with or without knowledge if the ship had become unseaworthy because of a dangerous condition created by noxious fumes in the hold. This was correct. . . . [36]

This Circuit sustained *Albanese's* theory of unseaworthiness in *Jones*, wherein a longshoreman brought suit against a vessel owner for damages because of injuries sustained when he breathed carbon monoxide fumes while working in the hold.[37] Additionally, the Fifth Circuit in *Grigsby* affirmed a finding that a barge was unseaworthy where the plaintiff entered a tank of the barge without knowledge that the tank contained poisonous carbon monoxide fumes. It, therefore, becomes apparent, after an examination of *Albanese, Jones* and *Grigsby* and after an examination of the facts presented at the trial of this case, this Court cannot hold as a matter of law [38] that the UBL–903 was not unseaworthy.

In the instant case the evidence introduced at trial showed that the barge

31. Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971). *Usner* stands for the proposition that a shipowner cannot be held liable for injuries to a longshoreman, which injuries were not caused by any defective condition of the ship or its gear, but, instead, were proximately caused by a fellow-longshoreman's single, instantaneous and unforeseeable *act* of negligence. In Radovich v. Cunard Steamship Co., 364 F.2d 149 (2nd Cir. 1966), the court spoke of the act-condition or operational negligence-unseaworthiness dichotomy.

32. Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 213, 83 S.Ct. 1185, 1190, 10 L.Ed.2d 297 (1963).

33. 346 F.2d 481 (2d Cir. 1965), rev'd on other grounds, 382 U.S. 283, 86 S.Ct. 429, 15 L.Ed.2d 327 (1965).

34. 451 F.2d 985 (3d Cir. 1971).

35. 412 F.2d 1011 (5th Cir. 1969), cert. dismissed, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970).

36. 346 F.2d 481, 483 (2d Cir. 1965).

37. *See* Rivera v. Rederi A/B Nordstjernan, 456 F.2d 970 (1st Cir. 1972). *See also* Friend v. Tropis Co., 382 F.2d 633 (4th Cir. 1967), cert. denied 390 U.S. 906, 88 S.Ct. 820, 19 L.Ed.2d 872 (1968) (implies that had static electricity in the hold emanated from the ship, the vessel would be unseaworthy, however, when the static electricity did not emanate from the ship but was caused by entry into the ship of an isolated unforeseeable causative agent from without the ship [as in Morales v. City of Galveston, 370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed.2d 412 (1962)], there was no warranty of seaworthiness which had been breached by the shipowner).

38. It is not contended in the instant case that the status of the barge, the pattern of repairs or the extensive nature of the work to be done, West v. United States, 361 U.S. 118, 122, 80 S.Ct. 189, 192, 4 L.Ed.2d 161 (1959), were such that the warranty of seaworthiness should be held as a matter of law not to apply to Earles and McNamer. A person injured aboard a vessel, however, may not recover for unseaworthiness if the ship was undergoing major repairs and was not in navigation. *See* West, *supra*; Bryant v. National Transport Corp., 467 F.2d 139 (3d Cir. 1972); McDonald v. United States, 321 F.2d 437 (3d Cir. 1963).

in question had carried toluene prior to its delivery to Walker, that plaintiffs were overcome after breathing poisonous fumes in a tank on the barge, and that they were subsequently treated medically for exposure to those fumes. Plaintiffs testified that they had been told only that they were to go over to Owens Island and clean up a barge. There were no signs on the barge to indicate what chemical the barge had been carrying, and the hatch covers to the tanks were lying open when the men arrived at the barge. Had it appeared at the trial that Walker knew it was being hired to remove poisonous fumes and that this knowledge was communicated to the plaintiffs who were employees of Walker, then plaintiffs might not have been entitled to rely upon a warranty of seaworthiness of the vessel as to that defect which they were being paid to remove.[39] As was stated by the *Grigsby* court, "[T]here is no warranty that the vessel is seaworthy with respect to the unseaworthy condition which is directly responsible for bringing aboard the persons claiming the benefit of the warranty."[40] There was no evidence presented, however, that Walker knew it was being hired to remove poisonous fumes from a tank on UBL–903; and plaintiffs had neither knowledge of the prior contents of the tank nor knowledge that the tank contained any poisonous fumes.

Accordingly, there is no error in the Orders of the district court which denied defendant's motions for summary judgment and for a directed verdict.

■■■ Generally, the question of unseaworthiness of a vessel is a question of fact to be determined by a jury.[41] Had the jury been correctly charged on the law of unseaworthiness in the court below, we would not disturb the verdict in favor of the plaintiffs. The trial judge charged the jury that:

> A ship owner's warranty of seaworthiness *includes* furnishing a reasonably safe place for a seaman or one working aboard the barge to perform his chores (emphasis added).[42]

In essence, the jury was told that the shipowner owed the duty to plaintiffs to provide a reasonably safe place to work or to perform their chores, and, therefore, if they found the tank aboard UBL–903 to be an unsafe place to work or to perform chores, the barge owner would be liable to plaintiffs for breach of the warranty of seaworthiness.

■■■ The duty of the vessel owner to furnish a reasonably safe place for a seaman or one working aboard the barge to perform his chores is clearly a duty of care, the breach of which results in liability for negligence when the breach proximately causes injury to a foreseeable person. The breach of the duty to use reasonable care to provide a safe place to work, without more, does not necessarily result in liability for unseaworthiness. The language used by the Supreme Court in cases which discuss the negligence of the vessel owner or the stevedore-employer are illustrative of the fact that the duty to use reasonable care to provide a safe place to work is found in the law of negligence and not in the law of the warranty of seaworthiness. For instance, in The M/V "Tungus" v.

---

39. Bruszewski v. Isthmian S.S. Co., 163 F.2d 720 (3d Cir. 1947), cert. denied, 333 U.S. 828, 68 S.Ct. 451, 92 L.Ed. ·1113 (1948). In Gindville v. American-Hawaiian S.S. Co., 224 F.2d 746 (3d Cir. 1955), we explained that Bruszewski meant "no more than if a carpenter is called in to repair a hole in a roof he cannot complain that a roof with a hole in it is an unsafe place to work." *Id.* at 747.

40. Grigsby v. Coastal Marine Service of Texas, Inc., 412 F.2d 1011, 1030 (5th Cir. 1969).

41. Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944); Siderewicz v. Enso-Gutzeit O/Y, 453 F. 2d 1094 (2nd Cir. 1972).

42. N.T. 144. Substantially the same language is used in the district court's opinion denying defendant's motion for summary judgment. Earles v. Union Barge Line Corp., 321 F.Supp. 1329, 1330 (W.D. Pa.1970). The case cited in support of this proposition is Venable v. A/S Det Forenede Dampskibsselskab, 399 F.2d 347, 353 (4th Cir. 1968).

Skovgaard,[43] the Court commented upon a negligence claim where "the law imposes upon [the ship and its owners] a duty of exercising ordinary care to provide [an employee of the company hired to discharge the ship's cargo] with a reasonably safe place to carry on his work of repairing the pump; [44] in Michalic v. Cleveland Tankers, Inc.[45] the Court speaks about a Jones Act claim of "negligent failure to provide [a crew member] with a safe place to work"; [46] in West v. United States,[47] the Court said "[o]f course, one aspect of the shipowner's duty to refrain from negligent conduct is embodied in his duty to exercise reasonable care to furnish a safe place to work;"[48] and, finally we see that in Atlantic Transport Co. v. Imbrovek[49] a stevedore received a verdict in negligence for the failure of his employer to see that he had a safe place in which to work.

The United States Supreme Court has clearly and repeatedly stated that "the duty to provide a seaworthy ship depends not at all upon the negligence of the shipowner or his agents,"[50] the shipowner's "duty to furnish a seaworthy ship is absolute and completely independent of his duty under the Jones Act to exercise reasonable care,"[51] and that "liability based upon unseaworthiness is wholly distinct from liability based upon negligence."[52] We interpret these statements to mean that the Supreme Court has not incorporated or included within the law of unseaworthiness those duties of care which a shipowner owes to persons working aboard the vessel, the breach of which, when the breach proximately causes injuries, would result in liability to the shipowner for negligence. The Court has not melded the duty to provide a seaworthy vessel with the duty to provide a safe place to work, but has repeatedly stated that the two concepts of seaworthiness and negligence should remain separate and distinct.

A good explanation as to why the concepts of negligence cannot be incorporated into the law of unseaworthiness was set forth by the Fifth Circuit in Cox v. Esso Shipping Company[53] as follows:

In view of another trial, we think it appropriate to point out that where, as is now so common, the seaman's case is for unseaworthiness and negligence under the Jones Act, the standards of each must be clearly distinguished.

One is an absolute duty, the other is due care. Where, as this charge did, the ultimate issue of seaworthiness of the gear was in terms of "reasonably suitable" for the work intended, and other issues, such as defendant's negligence and plaintiff's contributory negligence and the distinctly unnautical form of "unavoidable accident" speak in terms of due care, i. e., what a reasonably prudent person would do, there is a great hazard that the jury will get the impression that all is to be tested by one gauge. Of course, that is not so. The owner has an absolute duty to furnish reasonably suitable appliances. If he does not, then no amount of due care or prudence excuses him, whether he knew or could have known, of its deficiency at the outset or after use. In contrast, under the negligence concept, there is only

43. 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959).

44. *Id.* at 594, 79 S.Ct. at 508.

45. 364 U.S. 325, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

46. *Id.* at 331, 81 S.Ct. at 11.

47. 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959).

48. *Id.* at 123, 80 S.Ct. at 193.

49. 234 U.S. 52, 34 S.Ct. 733, 58 L.Ed. 1208 (1914).

50. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 544, 80 S.Ct. 926, 930, 4 L. Ed.2d 941 (1960).

51. *Id.* at 549, 80 S.Ct. at 932.

52. Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 498, 91 S.Ct. 514, 517, 27 L.Ed.2d 562 (1971).

53. 247 F.2d 629 (5th Cir. 1957).

a duty to use due care, i. e., reasonable prudence, to select and keep in order reasonably suitable appliances. Defects which would not have been known to a reasonably prudent person at the outset, or arose after use, and which a reasonably prudent person ought not to have discovered would impose no liability.[54]

■ We have been unable to locate any opinion by either the United States Supreme Court or by this circuit which has stated that the separate liabilities for unseaworthiness and negligence are to be considered a single doctrine with the respective duties of care found in the law of negligence being incorporated into the duty of the shipowner to provide a seaworthy vessel. Indeed, the duty to provide a seaworthy vessel, for which the shipowner may be liable in unseaworthiness, differs considerably from the duty of care owed by the shipowner to others working on or around the vessel.[55] The former involves the duty of the shipowner to provide things about the ship which are in a condition reasonably fit for the purpose for which they are to be used, while the latter involves the breach of a duty of care which results in liability in negligence. This separation of concepts remains even though it is conceivable that both duties may have been breached by the same occurrence. .

■ We consider it crucial that the concepts of unseaworthiness and negligence should not be merged in a case such as this where the vessel owner was out of possession and control of the barge when the injuries occurred, where the sole issue presented to the jury was whether the vessel was unseaworthy, and

where there was no claim of negligence. As was stated in West v. United States: [56]

Of course, one aspect of the shipowner's duty to refrain from negligent conduct is embodied in his duty to exercise reasonable care to furnish a safe place to work. But we do not believe that such a duty was owed under the circumstances of this case. Petitioner overlooks that here the respondent had no control over the vessels, or power either to supervise or to control the repair work in which petitioner was engaged. We believe this to be decisive against both aspects of plaintiffs' dual theory. . . . It appears manifestly unfair to apply the requirement of a safe place to work to the shipowner when he has no control over the ship or the repairs, and the work of repair in effect creates the danger which makes the place unsafe.[57]

The duty of care of the vessel owner may vary in regard to the employees of the independent contractor depending upon the jury findings as to when the defective condition arose and the knowledge, if any, which the owner had of the defective condition. There was no evidence presented at the trial of this case as to whether the barge owner or Walker knew of the existence of fumes in the tank of UBL–903. This circuit adopted the reasoning of West in Bryant v. National Transport Corp.[58] where recovery based upon negligent failure of a shipowner to provide an employee of a shipyard with a safe place to work was denied where the cause of the accident was either the defective condition of the independent contractor's shipyard's equipment or its careless use by the contractor's em-

---

54. *Id.* at 637.

55. See, *e. g.*, Bryant v. National Transport Corp., 467 F.2d 139 (3d Cir. 1972) ; Ward v. Union Barge Line Corp., 443 F.2d 565 (3d Cir. 1971) ; Knox v. United States Lines Company, 294 F.2d 354 (3d Cir. 1961).

56. 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959).

57. *Id.* at 123, 80 S.Ct. at 193.

58. 467 F.2d 139 (1972). *See generally* Mesle v. Kea S.S. Corp., 260 F.2d 747 (3d Cir. 1958), cert. denied, 359 U.S. 966, 79 S.Ct. 875, 3 L.Ed.2d 834 (1959) (shipowner's duty of care is to exercise reasonable care to maintain the vessel in a safe condition for a business invitee, with due regard for the purpose of the presence of the business invitee).

ployees and where the shipowner was not in possession or control of the area or the activity in which the accident occurred.

 The trial court in this matter appears to have relied upon Venable v. A/S Det Forenede Dampskibsselskab [59] for its charge that the shipowner's warranty of seaworthiness included the duty to provide a reasonably safe place for a seaman to perform his chores. *Venable* was a case tried on the issues of both negligence and unseaworthiness, and the Fourth Circuit discussed both concepts in its opinion. While the *Venable* court did state that "operational negligence has been subsumed under the doctrine of unseaworthiness, and a trial court's instructions should no longer attempt to distinguish between the two," [60] the United States Supreme Court in *Usner* [61] has since then reiterated that operational negligence has not been subsumed under the doctrine of unseaworthiness. We, therefore, today decide that under the facts of this case the warranty of sea-

worthiness does not include the duty to provide a reasonably safe place for a seaman to perform his chores, and it was reversible error to use the above-quoted language in the charge (page 1104, *supra*). The general maritime law's doctrine of seaworthiness of the vessel is separate and distinct from the general law of negligence, and the two should not have been combined by the trial court in this case. Whether the barge was unseaworthy depends solely upon whether it was or was not reasonably fit for the purpose for which it was to be used, and this was the sole issue before the jury. We, therefore, conclude that under the facts of this case an instruction to the jury that the warranty of seaworthiness "includes" furnishing a reasonably safe place for a seaman or one working aboard the barge to perform his chores, was not appropriate. We, therefore, reverse the judgment and remand for a new trial [62] on the issue of liability only in accordance with this opinion.[63] The trial judge may make the determination

---

59. 399 F.2d 347 (4th Cir. 1968).

60. *Id.* at 351.

61. 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed. 2d 562 (1971). Prior to *Usner*, the Fifth Circuit had rejected the idea of "instant unseaworthiness," holding that operational negligence of an independent contractor's employee which occurred at the moment of injury to a co-worker did not render the vessel unseaworthy. Antoine v. Lake Charles Stevedores, Inc., 376 F. 2d 443 (5th Cir.), cert. denied, 389 U.S. 869, 88 S.Ct. 145, 19 L.Ed.2d 146 (1967) (cause of accident was concurrent negligence of plaintiff and co-worker). *Accord*, Robichaux v. Kerr McGee Oil Indus. Inc., 376 F.2d 447 (5th Cir. 1967). Although Mascuilli v. United States, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743 (1967) created confusion in some courts such as the Fourth Circuit in Venable v. A/S Det Forenede Dampskibsselskab, 399 F.2d 347 (4th Cir. 1968) as to whether the defense of operational negligence was now no longer valid so that the shipowner could be held liable for "instant unseaworthiness" resulting from the single and instantaneous isolated act of negligence which proximately caused personal injuries, the Fifth Circuit in Grigsby v. Coastal Marine Service of Texas, Inc.,

412 F.2d 1011, 1033 (5th Cir. 1969) continued to reject any idea that "the very finding of operational negligence is a simultaneous finding of unseaworthiness." And, in Luckenbach Overseas Corp. v. Usner, 413 F.2d 984, 985 (5th Cir. 1969), aff'd 400 U.S. 494, 91 S.Ct. 514 (1971), the Fifth Circuit relied upon its decision in *Grigsby* when it decided in the negative the issue of "whether a ship is rendered unseaworthy as a result of the instantaneous negligence of stevedores, this negligence resulting in the injury of another stevedore, when all the equipment and appurtenances aboard the ship are admittedly in a seaworthy condition."

62. Even though Union Barge has withdrawn its motion for a new trial, we can properly grant a new trial. *See* Slaughter v. Philadelphia National Bank, 417 F. 2d 21, 33 at n. 22 (3d Cir. 1969); 28 U.S.C. § 2106.

63. The other issue raised by the appeal as to whether the barge owner has the status to ascertain the amount of the liens for Longshoremen's Act payments and benefits and to have the judgment altered or amended to protect the lien need not be decided.

to include in such new trial the issue of damages unless "such action appears. to the court inconsistent with substantial justice." F.R.Civ.P. 61.