**Jack D. LACAZE, Plaintiff-Appellee,**

v.

**Egon OLENDORFF, Defendant,**

**Mississippi Valley Barge Line Company, Defendant-Appellant.**

**No. 74–3002.**

United States Court of Appeals, Fifth Circuit.

Feb. 12, 1976.
Rehearing En Banc Granted March 19, 1976.

---

Thomas W. Thorne, Jr., New Orleans, La., for defendant-appellant.

Julian R. Murray, Jr., New Orleans, La., for plaintiff-appellee.

James L. Schupp, Jr., New Orleans, La., for Egon Olendorff.

Before COLEMAN, CLARK and INGRAHAM, Circuit Judges.

INGRAHAM, Circuit Judge.

Jack D. Lacaze (appellee), an employee of an independent stevedoring company, was severely injured while assisting in the discharge of 800-pound, T-shaped slabs of copper from the M/S HINRICH OLENDORFF into Barge M/V–134.[1] Appellee filed a *Sieracki*-type[2] action against the owner of M/S HINRICH OLENDORFF and the owner of Barge M/V–134 (appellant). After dismissing his action against the owner of M/S HINRICH OLENDORFF, appellee proceeded to trial against appellant claiming both negligence[3] and unseaworthi-

---

1. Barge M/V–134 is an open hopper barge measuring approximately 195 feet in length, 35 feet in width, and 12 feet in depth.

2. In *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), the Supreme Court conferred on longshoremen the right to recover for injuries caused by an unseaworthy vessel.

3. At the beginning of trial, appellee voluntarily dropped the negligence claim against appellant and proceeded only on his claim that the barge was unseaworthy. During the trial, the following transpired:

 Mr. Hebert: I think Mr. Murray asked the Court to withdraw the negligence claims and I would appreciate it being done on the record at this time.

ness. Appellant denied contentions of negligence and unseaworthiness, and claimed that appellee's negligence was the proximate cause of the injuries.

A jury found appellant liable based on the unseaworthy condition of the vessel and assessed damages at $180,000. Because of appellee's twenty per cent contributory negligence, the judgment was reduced to $144,000. Appellant asserts claims of error relating to instructions and evidentiary rulings by the trial court, sufficiency of evidence, and remarks by appellee's counsel during jury argument.

### FACTS

During the evening of November 1, 1970, appellee and several other longshoremen were assigned to work aboard Barge M/V–134, assisting in the discharge of T-shaped copper slabs from the M/S HINRICH OLENDORFF. Appellee's particular function was to assure proper stowage of the slabs. Winches removed the copper slabs from the OLENDORFF'S No. 5 hatch and landed the material in the barge. Generally, two to six slabs were, then, picked up by a forklift and carried by a sling to the place of stowage. Appellee and Anthony Cooper disengaged the forklift sling, allowing the operator to bring another load.

When appellee and Cooper were adding a load of six slabs to the fourth of nine rows, one of the 800-pound copper slabs fell from its row and pinned appellee's leg to the floor. According to appellee, this accident was not an isolated incident; instead, it appears that five or six slabs fell during the evening.

Appellant claims the accident was caused by instantaneous operational negligence, while appellee attributes the proximate cause of the accident to a combination of several conditions which rendered the barge unseaworthy.

1. *Slack in mooring lines.* The barge was moored by several lines to the offshore side of the M/S HINRICH OLENDORFF; the OLENDORFF was moored to the Congress Street Wharf in the Mississippi River at New Orleans, Louisiana. Two interspring lines and two outerlines were placed to secure the barge and prevent it from moving up or down the river or in and out from the ship.

Appellee and Mr. Cooper testified that the amount of slack in the lines affects the tendency of the bow of the barge to "bob," or shift up and down. According to appellee, there was more than five feet of slack in the lines, an amount of slack that caused excessive movement of the ship and cargo. Appellant, suggesting that the mooring lines—even with excessive slack—would not affect the up and down movement of the bow, created a factual dispute for the jury to resolve.[4]

2. *Inadequate lighting.* Appellee claims that inadequate lighting contributed to an unseaworthy condition aboard the barge and contends that better lighting would have enabled him to detect

---

Mr. Julian Murray: That's correct, Your Honor. At the beginning of trial, we agreed to that. But, rather than interrupt things, we agreed we would do it at the end when we had a break.

The Court: All right, the plaintiff has withdrawn any contention regarding his right to recover on the negligence theory.

Mr. Julian Murray: That is correct, Your Honor.

4. The trial court charged the jury that:

"seaworthy condition means to be in a condition reasonably suitable and fit to be used for the purpose or use for which [the vessel was] provided or intended. An unseaworthy condition may result from the lack of an adequate crew, the lack of adequate manpower to perform a particular task on a ship or an improper use of otherwise seaworthy equipment or, the lack of necessary equipment. . . . [plaintiff] says that the vessel was unseaworthy and that it was not properly moored to the ship from which the copper ingots were being unloaded, thereby allowing an unnecessary and improper amount of rocking and shifting. . . . I charge you that the plaintiff, Mr. Lacaze, is not required to prove that the entire barge was unseaworthy, that is, that she would sink if she attempted to float or anything of that nature. All that he must prove is that the condition involved rendered the barge not reasonably fit for its intended purpose and that he was injured as the proximate result of that unseaworthiness."

the falling load in time to escape injury. Appellant contested allegations of poor illumination, thus raising a factual dispute for the jury's resolution.[5]

3. *Dangerous stowage.* Because the material was stowed at a five degree angle, almost upright, against metal surfaces, the slabs propensity to fall was substantial. When the slabs are stowed at a greater angle—ideally twenty to twenty-five degrees—the risk of accident is reduced. In fact, appellee's expert witness testified that if the slabs were imbedded in dunnage at thirty degrees, it would not have fallen.

Appellee and Cooper stated that suitable dunnage was not available aboard Barge M/V–134 for the discharge operations of November 1, 1970. Nevertheless, the foreman testified that dunnage suitable for *any* discharging operation was available on the wharf; but neither Cooper nor appellee requested dunnage. Again, the evidence presented a factual dispute for resolution by the jury.[6]

4. *Violation of safety regulations.* Somewhat related to the stowage claim, appellee alleged that appellant violated the safety regulations relating to stowed cargo:

"When necessary cargo shall be secured or blocked to prevent its shifting or falling." *Safety and Health Regulations for Longshoring,* 29 CFR § 1918.83(a).

Evidence indicates that the copper slabs were not blocked or secured; moreover, it appears that the cargo fell on several occasions throughout the evening. The issue of appellant's violation of the safety regulations, therefore, was properly submitted to the jury.[7]

■ This case, like many other personal injury cases,[8] involves vigorously contested facts. The jury is entrusted with the fact-finding function and is entitled to " 'select from among conflicting inferences and conclusions . . . which it considers most reasonable.' . . . Jurors are supposed to reach their conclusions on the basis of common sense,

---

5. The court charged, "[plaintiff] said that the barge failed to provide adequate and proper lighting for the plaintiff to see and thereby avoid potential hazards. Now, with respect to each of those charges, you look to the evidence in the case to see whether anyone of them has been so sustained."

6. The court charged: "Plaintiff, Jack Lacaze, claims that the vessel, the barge M/V 134 is unseaworthy [because] the cargo in the vessel, that is, the copper anodes or, bubbles, were not secured or blocked to prevent the shifting or falling as required by Section 29 of the Code of the Federal Regulations at Section 1918.838."

7. The court charged:

"Now, plaintiff alleges and claims that the defendant shipowner violated the following provisions of the United States Department of Labor Safety and Health regulations for longshoremen.

"In this respect I charge you that the United States Department of Labor has promulgated certain regulations in the Code, which appears in 29 Code of the Federal Regulations, part 1918, which deals with safety and health regulations for longshoring under sub-part 'H', which deals with regulations

concerning the handling of cargo, specific section 1918.83, entitled stowed cargo, tierring and breaking down, section 'A', when necessary, cargo shall be secured or blocked to prevent its shifting or falling.

"Now, if you find from the preponderance of the evidence in this case, that this regulation which I have just read was violated, then such violation would have rendered the vessel unseaworthy regardless of whether the shipowner had knowledge of the violation, for that is the nature of the owner's duty of seaworthiness.

"Now, in that respect, of course, you heard some testimony regarding whether that was necessary, and you determine whether it was necessary under the circumstances of this case that the cargo should have been secured or blocked to prevent its shifting or falling, and if you found it unnecessary, why of course, then the regulation would not have been violated.

"Now, if such unseaworthiness, if it existed, that is, the violation of this regulation was the proximate cause of the plaintiff's injury, then the defendant shipowner would be liable to the plaintiff."

8. *Vickers v. Tumey,* 290 F.2d 426, 428–29 (5th Cir. 1961).

common understanding and fair beliefs, grounded on evidence consisting of direct statements by witnesses or proof of circumstances from which inferences can fairly be drawn." *Schulz v. Pennsylvania R.R.,* 350 U.S. 523, 526, 76 S.Ct. 608, 610, 100 L.Ed. 668 (1956). In this case we conclude that the jury reasonably could find that the vessel was unseaworthy due to inadequate lighting, slack in mooring lines, and dangerous stowage conditions which violated safety regulations, and that the unseaworthy condition was the proximate cause of appellee's injuries.

Evidence was sufficient to require submission of the unseaworthiness issues to the jury; thus, a directed verdict or judgment n. o. v. would have been improper. *Lavender v. Kurn,* 327 U.S. 645, 652–53, 66 S.Ct. 740, 90 L.Ed. 916 (1946); *Boeing Co. v. Shipman,* 411 F.2d 365, 373–75 (5th Cir. 1969) (*en banc*); *Siderewicz v. Enso-Gutzeit,* 453 F.2d 1094 (2d Cir. 1972).

## INSTRUCTIONS [9]

1. *Unseaworthiness.* Appellant asserts that the district court's jury instructions on unseaworthiness were erro-

---

**9.** To do justice to the trial court's instructions, it is necessary to quote them at some length. If unbalanced at all, the instructions somewhat favor the appellant. In pertinent part they read:

"Now, having determined the facts from the evidence before you, it is now, of course, your duty to follow the rules of law stated in these instructions in reaching your verdict by applying this law to the facts. You are not to single out one instruction alone as stating the law, but you are supposed to consider these instructions altogether. . . .

"Now, in this case, the plaintiff, Jack Lacaze, filed his complaint in this court, in which he claimed that while he was a longshoreman in the service of the defendant's vessel, the barge M/V 134, that he was severely, painfully and permanently injured as a result of the unseaworthiness of the barge in various respects.

"Now, in due time, the defendant filed its answer in writing in this court, in which ·it denied the contentions of the plaintiff that its barge was unseaworthy and it denied that the plaintiff was injured permanently as he claimed, and denied that it was liable to plaintiff in any amount.

"It also affirmatively contended that plaintiff was, in any event, guilty of negligence, causing his own injuries.

"Now, these are substantially the contentions of the parties and what the truth of these various matters may be is purely something for you to determine from the evidence in this case.

"The effect of these contentions is to put the burden of proof on the plaintiff to prove every essential element of his claim by a preponderance of the evidence.

"Now, if the proof should fail to establish any essential element of plaintiff's claim by a preponderance of the evidence, then you should find for the defendant . . ..

"On this case, the plaintiff was a longshoreman and he has asserted a claim based on what is called unseaworthiness.

"Now, he, of course, if he establishes that he sustained injury and damages as a result of such unseaworthiness on the part of the defendant's vessel, why he would be entitled to a verdict.

"Now, of course, in that respect, the defendant denies that it violated any duty that it owed the plaintiff and denies that its barge was unseaworthy and in addition, it claims that he caused his own injuries or, contributed to his own injuries. ·. . .

"I charge you in this respect that the mere occurrence of an accident, of course, does not raise any presumption that the vessel was unsafe or unseaworthy.

"Plaintiff contends that he should recover because the barge was unseaworthy and in this respect I charge you that the duty to provide a seaworthy vessel extends not only to the members of the ship's crew, but to those who do work traditionally and historically done by members of the crew such as a longshoreman.

"There is a duty to provide a seaworthy vessel to the longshoreman who is working on it.

"Now, under the maritime law, every shipowner or operator owes to every member of the crew, including the longshoremen employed aboard the vessel, the non-delegable duty to keep and maintain the ship or barge and all its appurtenances, its gear and appliances, its tools, equipment of the vessel in a seaworthy condition at all times.

"*Now, to be in a seaworthy condition means to be in a condition reasonably suitable and fit to be used for the purpose or use for which they were provided or intended.*

"An unseaworthy condition may result from the lack of an adequate crew, the lack of adequate manpower to perform a particular task on a ship or an improper use of otherwise seaworthy equipment ·or, the lack of necessary equipment.

"In this case, I think the plaintiff charges that they failed to have any chocks or blocks or dunnage.

"Now, with respect to those two things, if you find that they were available and were just not used as a voluntary act on the part of the plaintiff, why then the failure to use those things couldn't constitute unseaworthiness.

"I charge you that the liability for an unseaworthy condition does not, in any way, depend upon the negligence or fault or blame.

"That is to say the shipowner or operator or the defendant in this case, is liable for all the injuries and consequent damages approximately caused by an unseaworthy condition existing at anytime, even though the owner or operator may have exercised due care in the circumstances and may have had no notice or knowledge of the unseaworthy condition which proximately caused the injury or damage.

"Plaintiff, Jack Lacaze, claims that the vessel, the barge M/V 134 was unseaworthy in the following particulars, one, he says that the cargo in the vessel, that is, the copper anodes or, bubbles, were not secured or blocked to prevent the shifting or falling as required by Section 29 of the Code of the Federal Regulations at Section 1918.838.

"Two, he says that the vessel was unseaworthy and that it was not properly moored to the ship from which the copper ingots were being unloaded, thereby allowing an unnecessary and improper amount of rocking and shifting.

"And three, he said that the barge failed to provide adequate and proper lighting for the plaintiff to see and thereby avoid potential hazards.

"Now, with respect to each of those charges, you look to the evidence in the case to see whether any one of them has been so sustained.

"Now, in this respect, I charge you that the plaintiff, Mr. Lacaze, is not required to prove that the entire barge was unseaworthy, that is, that she would sink if she attempted to float or anything of that nature.

"All that he must prove is that *the condition involved rendered the barge not reasonably fit for its intended purpose and that he was injured as the proximate result of that unseaworthiness.*

"Now, if you find any unfitness on the part of the barge resulting in its being unseaworthy, but that such condition was not caused by any of the longshoremen, then it does not matter as far as the defendant's liability is concerned how long or how short a time a condition of such unfitness may have existed before the accident.

"Now, plaintiff alleges and claims that the defendant shipowner violated the following provisions of the United States Department of Labor Safety and Health regulations for longshoremen.

"In this respect I charge you that the United States Department of Labor has promulgated certain regulations in the Code, which appears in 29 Code of the Federal Regulations, Part 1918, which deals with safety and health regulations for longshoring under sub-part 'H', which deals with regulations concerning the handling of cargo, specific section 1918.83, entitled stowed cargo, tierring and breaking down, section 'A', when necessary, cargo shall be secured or blocked to prevent its shifting or falling.

"Now, if you find from the preponderance of the evidence in this case, that this regulation which I have just read was violated, then such violation would have rendered the vessel unseaworthy regardless of whether the shipowner had knowledge of the violation, for that is the nature of the owner's duty of seaworthiness.

"Now, in that respect, of course, you heard some testimony regarding whether that was necessary, and you determine whether it was necessary under the circumstances of this case that the cargo should have been secured or blocked to prevent its shifting or falling, and if you found it unnecessary, why of course, then the regulation would not have been violated.

"Now, if such unseaworthiness, if it existed, that is, the violation of this regulation was the proximate cause of the plaintiff's injury, then the defendant shipowner would be liable to the plaintiff. . . .

"Now, *I charge you that the owner of the vessel is not, however, required to furnish an accident-free ship. Its duty is only to furnish a vessel and appurtenances reasonably fit for their intended use and a crew that is reasonably adequate in numbers for their assigned tasks.*

"Now a vessel is not called on to have the best of appliances and equipment or the finest of crew, but only such gear that is reasonably proper and suitable for its intended use and a crew that is reasonably adequate.

"If you find, therefore, that the defendant had a capable, competent crew and appliances and gear that was safe and suitable for their intended use, why then the vessel could not be said to have been unseaworthy, and defendant would be entitled to a verdict in this cause of action in that respect.

"I charge you that unseaworthiness, however, may consist of a vessel being an unsafe place to work.

"Employers of seamen have a legal duty to provide their employees with a safe place within which to work. If you find that in this case, the plaintiff was injured because the defendant failed to furnish him with a reasonably safe place to work, and that the plaintiff's working conditions could have been made safe by the exercise of reasonable care, then you

neous and confusing. Specifically, appellant objects that the trial court's charge to the jury impermissibly injected the negligence concept of "reasonably safe place to work." In *Marshall v. Ove Skou Rederi A/S* this court stated:

> "The courts are, in the end, attempting to determine whether the seaman may perform his task aboard the ship with reasonable safety. . . . Articulating criteria to determine seaworthiness requires use of the language of negligence [citations omitted]." 378 F.2d 193, 196–97 (5th Cir. 1967).

may find that the vessel was unseaworthy and under those conditions, the plaintiff would be entitled to recover.

"But, in this respect, *I charge you that the owner of a vessel is not responsible for the negligence of a longshoreman as such. He is responsible only if their acts make the ship unseaworthy.*

"If you should decide that this accident was the result of the manner in which the plaintiff *and his fellow longshoremen* performed their duties on board the vessel, and that this was the proximate cause of the accident, and that there was no unseaworthiness of the vessel, and that the vessel did provide a safe place to work, why then and in that event the defendant would not be liable.

"Now, in this respect, I charge you that if you find that the barge's equipment with which the stevedore was performing his work was in all respects reasonably fit for its intended use, and failed in no way, but that it was simply negligently used by the longshoremen, then you must find that the barge was not unseaworthy in that respect.

"In addition, if you were to find that the plaintiff's injury was caused not by the condition of the barge or its appurtenances or equipment, but by the isolated personal negligent act of plaintiff's fellow longshoremen, then you must find that the barge was not unseaworthy in that respect. . . .

"But, no person may recover from injuries resulting solely from inherent and unavoidable risks.

"Therefore, the defendant *is not liable merely* because a longshoreman has been hurt. The defendant is liable only if he has failed to provide a seaworthy vessel in the manner that I have described before you.

"Now, if a longshoreman is injured as a result of a *normal hazard or risks of the business* in which he is engaged, and without fault on the part of anybody else, despite the fact

In *Sanford v. Caswell,* this court stated that a longshoreman's employer "had an absolute and non-delegable duty to furnish the seamen in their employ with safe and seaworthy appliance *and a safe place in which to work* [emphasis added]." 200 F.2d 830, 832 (5th Cir. 1953).

Even appellant's attorney, during closing argument, noted the connection between the concepts of a seaworthy vessel and a reasonably safe place to work:

> "Now, what is unseaworthiness? There's a duty on Valley Line Company to provide Mr. Lacaze and his fellow workers with a *reasonably safe*

that the ship and its equipment was seaworthy, he, of course, would not be entitled to recover for any injury.

"Now, we must next consider the matter referred to in the law as causation.

"You recall that I have stated that any unseaworthiness must be the proximate cause of some injury to afford the basis for liability because not every consequence that follows an accident necessarily results from it.

"In other words, in order to show proximate cause, it is necessary for the plaintiff to show not only that the unseaworthiness of the vessel played a substantial part in bringing about or actually causing the injury to him, but also that the injury was either a direct result or a reasonably probable consequence of negligence or unseaworthiness. . . .

"Now, the proximate cause of an injury is that cause which in a natural and continuous sequence, unbroken by any inefficient intervening cause produces the injury without such result, the injury could not have occurred.

"Now, the law in a case of this type regards *only proximate or immediate causes of accident* as those grounds upon which recovery may be given to a plaintiff.

"There can be no recovery for outside remote cause which we referred to as intervening cause which may have, and has no connection with, or the condition or operation being conducted at the time of the accident.

"Now, the defendant here contends that Mr. Lacaze was, himself, negligent and that his negligence caused his injury.

"That is the defense, and the burden of proof, of course, is on the defendant by a preponderance of the evidence.

"In this connection, I charge you that there can be no recovery against the warranty of seaworthiness nor condition of temporary unseaworthiness brought by the same seaman who injures himself as the result of the very defect he may have created. . . ." [Emphasis added]

*place to work, a reasonably seaworthy vessel* [emphasis added]."

Nevertheless, appellant claims that *Earles v. Union Barge Lines Corp.*, 486 F.2d 1097 (3rd Cir. 1973), requires reversal of this case. In *Earles* a barge owner delivered the allegedly unseaworthy vessel to a contractor with instructions to "strip the barge of old cargo, cold water wash it, and pump it clean." 486 F.2d 1097, 1099. While cleaning the vessel, plaintiffs were injured as a result of inhaling dangerous chemical fumes. Defendant delivered an unseaworthy barge for repair; plaintiffs were employed to restore the vessel to a seaworthy condition. Plaintiffs accepted employment realizing the inherent dangers. The district court, however, charged that "seaworthiness *includes* furnishing a reasonably safe place for a seaman or one working aboard the barge to perform his chores." 486 F.2d 1097, 1104. Nevertheless, it is clear, as the *Earles* decision recognizes, that "there is no warranty that the vessel is seaworthy with respect to the unseaworthy condition which is directly responsible for bringing aboard the persons claiming the benefit of the warranty." *Grigsby v. Coastal Marine Service of Texas*, 412 F.2d 1011, 1030 (5th Cir. 1968); *see also West v. United States*, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959).

The holding in *Earles* was not intended to extend to the facts of the instant case. 486 F.2d 1097, 1107. And we do not recognize *Earles* as dispositive of this case.

█ In evaluating the adequacy of the district court's charge to the jury, we consider the charge as a whole. Because the instructions taken together properly express the law applicable to the case, "there is no just ground of complaint, even though an isolated and detached clause is in itself inaccurate, ambiguous, incomplete, or otherwise subject to criticism." *Delancey v. Motichek Towing Service, Inc.*, 427 F.2d 897, 901 (5th Cir. 1970), quoting *Nolan v. Greene*, 383 F.2d 814, 816 (6th Cir. 1967); accord, *International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714, 728 (5th Cir. 1975); *Vickers v. Tumey*, 290 F.2d 426, 429–33 (5th Cir. 1961).

2. *Safety and Health Regulations.* Appellant complains that the district court's instructions relating to safety regulation 29 CFR 1918.83(a) was erroneous. This court confronted the applicability of safety regulations in *Marshall v. Isthmian Lines, Inc.*, 334 F.2d 131 (5th Cir. 1964). In *Marshall* there was a violation of the 'Coast Guard Regulations relating to the shipment of hazardous articles. Chief Judge Brown, speaking for the court, stated the three issues that must be resolved to impose liability on the basis of the defendant's violation of the regulation: (1) sufficient evidence establishes a violation of the regulation; (2) the regulation is designed to protect the plaintiff; and (3) the regulation is designed to protect against the type of risk created in the case.' 334 F.2d 131, 134; *see* Bue, Admiralty Law in the Fifth Circuit—A Compendium for Practitioners I, 4 Hous.L.Rev. 347, 401 (1966).

█ The purpose of these regulations is to promote safety in the industry and to establish an unambiguous standard for measuring industrial safety as it relates to longshoremen, harbor workers or other business invitees that come into contact with a vessel. That purpose is advanced when the court instructs the jury as it did in this case. Considering the charge as a whole, we conclude that the instructions properly express the law applicable to this case. *Arthur v. Flota Mercante Gran Centro Americana S.A.*, 487 F.2d 561, 563–64 (5th Cir. 1973); *Delancey v. Motichek Towing Service, Inc., supra*, at 901.

We have carefully reviewed appellant's other assignments of error relating to instructions by the trial court and find them meritless.

## EVIDENTIARY RULINGS

1. *Limitations on appellant's right to cross-examination.* Dr. Claude Sommers Williams, the orthopedic surgeon who examined and subsequently treated ap-

pellee, provided extensive testimony concerning the nature and extent of injuries sustained aboard Barge M/V–134. Dr. Williams concluded that after the operation and thirteen months of post-operative treatment and therapy, appellee would suffer twenty-five per cent permanent partial impairment of the function of the right leg:

"I think that he still had function of his leg. I think that you could say it was seventy-five per cent as functional as it was before the injury, but this takes into account that he may develop arthritis later, and that he doesn't have the normal flexion of his knee and he doesn't have a medial meniscus and he has instability. These are terms that are used to estimate this at about twenty-five per cent."

Office visits continued beyond January 1974, during which appellee continued to complain of pain and loss of strength in his right leg.

Appellee's counsel asked his expert witness whether he ever gave an opinion concerning the prospects of appellee returning to his former occupation. Dr. Williams replied that he wrote several persons concerning appellee's inability to work:

"[In the June 22nd letter to a union official] I stated that he has old healed fracture of his right femoral condyle with persistent limitation of his right knee and slight medial instability. I stated that there was approximately twenty-five per cent permanent partial impairment of the right lower extremity and said in the letter that this impairment impairs his ability to climb ladders and stoop and bend and doing heavy lifting and I felt that it would impair his ability to climb down ladders into the hold of ships, which I felt—I thought it would be possible for him to do light work, sitting or standing, if that type of work was available.

"Mr. Lacaze, I think, was not satisfied with the letter . . . and requested that I write another . . . .

In fact, I had a difficult time satisfying his request for a letter to state his situation . . ..

"In [the second] letter I stated that due to a fracture to the right femoral condyle in an accident occurring November 1, 1970, this patient is permanently disabled from doing his prior occupation as a longshoreman. This is based on his inability to climb ladders and the impairment to bend, stoop or do any heavy lifting."

It is clear that Dr. Williams was retained to treat appellee for leg injuries and not to merely provide expert testimony. Additionally, the surgeon's testimony included a complete background of the letters, including facts that the writings were prepared on appellee's request and appellee's dissatisfaction with the contents.

On cross-examination of Dr. Williams, when appellant's counsel asked questions relating to the June 22 correspondence with a union official, the following comments were recorded:

"Mr. Murray: We note an objection to the question and the answer.

"Mr. Hebert: It was brought out on direct examination by you, Mr. Murray.

"Mr. Murray: I just asked an objection be noted. Go ahead."

Appellant then continued his cross-examination of Dr. Williams without interruption.

■ Appellant claims, however, that the jury was left "in some sort of situation where they will be wondering who is [the union official to whom Dr. Williams' letter was addressed] and why were these letters written." Considering the following testimony, appellant's claim is clearly without merit:

"Q Doctor, I would like to ask you a few questions, if I might, regarding your treatment and your examinations of Mr. Lacaze from the time when you first saw him to the present time, but before I do that, I would just like to ask you a couple of questions regard-

ing your dealings with Mr. Lacaze and your correspondence with Mr. Alfred Chittenden as brought out in the direct examination by Mr. Murray.

Do you know why Mr. Lacaze requested that you write a letter to Mr. Chittenden?

A I am not absolutely certain of the details of it. I think that Mr. Chittenden has to do with the disability insurance program for the longshoremen's union and I think that Mr. Lacaze—it is my understanding he needed a letter stating that he was unable to work in order to qualify for the longshoremen's disability benefits.

\* \* \* \* \* \*

Q What address did you write to Mr. Chittenden?

A President, Local Union # 1418, 226 Crossman St., New Orleans, Louisiana, 70130."

■ Even assuming an error was committed, we do not believe it was of such magnitude as to require reversal. On appeal, errors during the course of a trial which do not affect the substantial rights of the parties are to be disregarded. Fed.R.Civ.P. 61; *International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714, 727 (5th Cir. 1975); *Wallace v. Ener*, 521 F.2d 215, 222 (5th Cir. 1975).

■ 2. *Effect of inflation on future lost wages.* Dr. Melville Z. Wolfson, a professor of economics and finances at Louisiana State University, was called by appellee to testify on the issue of damages, specifically in regard to future lost earnings. When Professor Wolfson included the factor of an inflation rate of three per cent in the calculations, appellant stated his objection. The trial court erred in overruling appellant's objection. *Johnson v. Penrod Drilling Co.*, 510 F.2d 234 (5th Cir. 1975) (on rehearing *en banc*) *cert. den.*, 423 U.S. 839, 96 S.Ct. 69, 46 L.Ed.2d 58 (1975).

In *Penrod* this court stated:

"We judicially notice that inflationary conditions in this nation's economy have worsened in the interim between the November 21, 1972 panel opinion and today and we recognize that this accelerating rate of inflation increases the likelihood that inflation could become a predictable condition for the future. Nevertheless, with this added light, we still cannot so surely discern the shadow of inflation as a coming event as to warrant requiring its inclusion in a present rule for calculating future damages. The worsening of inflation might as readily foretell a recession or a depression as its continuity. Strong governmental countermeasures have been proposed and their efficacy is still unknown. Then too, if future inflation does cause higher wages, experience predictably demonstrates that higher interest rates on investments which have always accompanied inflation will also occur and this factor will mitigate the failure to include an inflationary surcharge in wage rate calculations."

510 F.2d 234, 236. *Accord, Williams v. United States*, 435 F.2d 804 (1st Cir. 1970); *Frankel v. Heym*, 466 F.2d 1226 (3rd Cir. 1972); *United States v. Furumizo*, 381 F.2d 965 (9th Cir. 1967). The trial court erroneously overruled appellant's objection to Professor Wolfson's testimony concerning the effect of inflation on future loss earnings. This case, therefore, must be reversed and remanded for further proceedings on the issue of damages.

### JURY ARGUMENT

Appellant urges that the trial court erred by refusing to declare a mistrial after counsel for appellee made improper remarks during jury argument. Appellant specifies two prejudicial and inflammatory lines of argument: (1) reference to the indemnity right of the barge owner and (2) reference to the "golden rule" as a means to evaluate damages.

■ 1. *Indemnity rights.* We conclude that under the facts of this case the trial court's instruction to disregard the objectionable matter was sufficient to cure any possible error. *Har-Pen Truck Lines, Inc. v. Mills*, 378 F.2d 705,

713–15 (5th Cir. 1967); *Nevels v. Ford Motor Co.*, 439 F.2d 251, 258 (5th Cir. 1971); *Zeigler v. Seaboard Coast Line R.R.*, 437 F.2d 80 (5th Cir. 1971).

2. *Golden rule.* Because appellant failed to timely object to opposing counsel's jury argument, appellant's claim is without merit. *Skaggs v. J. H. Rose Truck Line, Inc.*, 435 F.2d 695 (5th Cir. 1970). Additionally, the trial court's instructions to disregard appellant's "golden rule" appeal cured any possible error. *Har-Pen Truck Lines, Inc. v. Mills, supra; Nevels v. Ford Motor Co., supra.*

Appellant's claims of error relating to improper jury argument, therefore, are without merit.

## CONCLUSION

We affirm upon the issue of liability and reverse and remand on the issue of damages for reconsideration in light of *Johnson v. Penrod Drilling Co., supra.* It is the intention of this remand to open all relevant matters relating to the issue of damages, including the right to amend all original and responsive pleadings. The district court shall have its usual discretion to conduct the remanded proceedings in such manner as it shall deem appropriate and may direct the parties to utilize all or such portions of the record previously developed as may be relevant.

Affirmed in part; reversed and remanded in part.

Before BROWN, Chief Judge, WISDOM, GEWIN, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, MORGAN, CLARK, RONEY, GEE and TJOFLAT, Circuit Judges.

BY THE COURT:

A majority of the Judges in active service, on the Court's own motion, having determined to have this Case [526 F.2d 1213] reheard en banc,

It is ordered that this cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk shall set a briefing schedule for the filing of supplemental briefs.