Benjamin HARRISON and Rosalind
Harrison, Plaintiffs, Appellants,

v.

SEARS, ROEBUCK AND COMPANY
and Emerson Electric Company,
Defendants, Appellees.

No. 92–1055.

United States Court of Appeals,
First Circuit.

Heard Sept. 15, 1992.
Decided Dec. 9, 1992.

Leonard Glazer with whom Frank E. Glazer and the Law Offices of Leonard Glazer, P.C., Boston, Mass., were on brief, for plaintiffs, appellants.

David A. Barry with whom Regina E. Roman, Barbara L. Siegel, and Sugarman, Rogers, Barshak & Cohen, P.C., Boston, Mass., were on brief, for defendants, appellees.

Before TORRUELLA and BOUDIN, Circuit Judges, and BRODY,* District Judge.

BRODY, District Judge.

Plaintiffs, Benjamin and Rosalind Harrison, appeal from a judgment entered after a jury verdict denying them relief in a personal injury suit against Sears, Roebuck & Company and Emerson Electric Company. Plaintiffs appeal several evidentiary rulings of the trial court including: the admission of an x-ray as evidence, an instruction to the jury on the significance of the x-ray, the exclusion of certain expert

testimony, and the exclusion of evidence of subsequent remedial measures to the product which allegedly caused the injury in question. Because we are satisfied that the trial judge did not abuse his discretion in the challenged evidentiary rulings, WE AFFIRM.

## I. BACKGROUND

Appellants' decedent, Benjamin Harrison, allegedly sustained injuries to two fingers while using a Craftsman 6⅛ inch Jointer–Planer ("jointer"). Benjamin Harrison was a 70 year old man who was using the jointer to do carpentry work on kitchen cabinets for his home. The jointer was purchased from Sears, Roebuck & Company ("Sears") and was designed, manufactured and distributed by Emerson Electric Company ("Emerson").

The complaint was filed on February 26, 1986, by Appellants, Benjamin and Rosalind Harrison, against Appellee, Sears. The complaint alleged negligence and breach of warranty with respect to the jointer, resulting in personal injuries to Benjamin Harrison and loss of consortium to Rosalind. An answer was filed by Sears on March 27, 1986. Subsequently, on June 21, 1987, the Harrisons filed an amendment to the complaint, adding Emerson as a defendant and alleging that Emerson engaged in the design development, testing, manufacturing, marketing and sale of the jointer.

Benjamin Harrison died on June 20, 1990 from an illness unrelated to his injuries. Frederick Harrison, Benjamin's son, was appointed executor of his father's estate, and he was substituted in this action.

The trial began on November 18, 1991. On November 25, 1991 the jury returned a verdict for the defendants. Plaintiffs' theory at trial was that the accident occurred when Benjamin Harrison's left hand entered an unguarded aperture near the on-off switch and came into contact with the jointer's blade. In response to the first special interrogatory posed, "Was plaintiff injured as a result of unintentionally insert-

---

* Of the District of Maine, sitting by designation.

ing his fingers into the aperture?," the jury responded "no". Therefore, the jury did not respond to the interrogatories regarding negligence and breach of warranty. Judgment was entered on November 27, 1991. Plaintiffs moved for a new trial on December 9, 1991, and the motion was denied on December 11, 1991. This appeal followed.

The precise way in which the accident occurred was heavily disputed at trial. The deposition testimony of the Appellants' decedent stated that while Benjamin Harrison was in the process of shutting off the jointer, his left hand slipped from the on-off switch and entered into an opening allowing his fourth and fifth fingers to make contact with moving cutter blades. Appellants allege that this contact resulted in the partial amputation of the decedent's left ring finger and injury to his left fifth finger.

Appellants' engineering expert, Bradford Schofield, testified that the opening represented an unreasonably hazardous design that violated accepted industry standards and resulted in the accident. Mr. Schofield testified that the opening could have been eliminated at negligible cost.

Appellants' medical expert, Dr. Stephen Meagher, testified with regard to the permanent injury suffered by Benjamin Harrison as a result of the incident. During cross-examination, Dr. Meagher testified that in his opinion, the accident occurred as a result of the entry of Benjamin Harrison's fingers into the opening. Appellants sought to introduce Dr. Meagher's assessment of an x-ray of Mr. Harrison's hand. Although Appellants never listed Dr. Meagher as a liability expert during pretrial discovery, they sought to have his testimony admitted during their case-in-chief to *rebut* the anticipated testimony of Appellees' expert, Jack Hyde, with regard to the significance of the x-ray in determining the cause of the accident. Appellants argued that this testimony was proper because they had not been notified prior to trial that the x-ray would be relied on. The trial judge ruled that Meagher could not offer an opinion regarding how the acci-

dent occurred on direct examination because Appellants had never disclosed prior to trial that Meagher would testify as to causation.

Appellees then presented their engineering expert, Jack Hyde, who testified that the accident could not have occurred as Benjamin Harrison claimed. Hyde gave two reasons for his opinion. First, Hyde testified that because of the design of the jointer, it would be difficult to get one's fingers into the opening unintentionally. In addition, Hyde opined that the injury could not have occurred as Harrison alleged because the angle and location of the cuts on Harrison's fingers, as depicted in the x-ray, were inconsistent with his testimony as to how the fingers were cut. Hyde was permitted to use the x-ray in conjunction with his testimony over Appellants' objection that he lacked qualification as an expert with respect to x-ray interpretation. Appellants also objected on the grounds that Appellees failed to give adequate notice regarding Hyde's anticipated testimony with respect to the x-ray. Appellants' further objected to the court's instruction to the jurors that "they may conclude, to some extent, what [they] think an x-ray means." Trial Tr. at 61, *reprinted in,* Appellants' App. at 270.

Hyde was also permitted to testify that there had never been a similar complaint to Emerson despite Appellants' objection to the use of this negative evidence.

Finally, Appellants contend that the trial court's denial of their motion for a new trial should be reversed because the court sustained Appellees' objection when Appellants sought to cross-examine Hyde with regard to a subsequent design change which eliminated the opening in the jointer. Appellants argue that this cross-examination should have been permitted because Hyde testified during direct examination that there had been "no hazardous area left exposed next to the switch where you [could] unintentionally get your hand," even though he contributed to a subsequent design change which eliminated the opening in question. Trial Tr. at 40, *reprinted in* Appellants' App. at 249. Fur-

ther, Appellants argue that this cross-examination was proper because Appellees opened the door to this type of evidence when they touted Hyde's qualifications as an expert which included his work on the design of jointers.

## II. DISCUSSION

### A. *Use of the x-ray as evidence*

■ The district court allowed Appellees' engineering expert, Jack Hyde, to utilize an x-ray of Harrison's hand while testifying regarding the cause of Harrison's injuries. Appellants contend that Hyde was not a medical expert and thus not qualified to interpret x-rays. Appellants assert that the allowance of the use of the x-ray was an abuse of discretion. Appellees argue in response that in this context the x-ray is equivalent to a picture and, therefore, requires no specialized knowledge to view in order to determine the angle of the break in a bone. Appellees further contend that there is no merit to Appellants' position because, as an accident reconstructionist, Hyde had extensive experience with x-rays.

The admission of expert testimony under Fed.R.Evid. 702 is within the trial court's discretion and will be reversed only for an abuse of discretion. *Navarro de Cosme v. Hospital Pavia*, 922 F.2d 926, 931 (1st Cir. 1991). Specifically, the trial judge has discretion in determining: (1) whether Hyde was sufficiently qualified to testify regarding the x-ray of Harrison's hand, and (2) whether Hyde's testimony would, in fact, assist the trier of fact to understand the evidence or to determine a fact in issue. *Raymond v. Raymond Corp.*, 938 F.2d 1518, 1526 (1st Cir.1991).

There was evidence that Hyde had extensive formal education in safety engineering, human factors engineering and product safety. Also, the record demonstrates that Hyde had over ten years of experience reconstructing accidents involving power tools and hand injuries. Moreover, Hyde had read x-rays of hand and body parts involved in accidents on numerous occasions, had consulted with doctors concerning his interpretation of x-rays, and he

testified that x-rays were often interpreted and relied upon by experts in his field.

The record demonstrates that the trial judge was well within his discretion in determining that Hyde possessed sufficient knowledge, skill, experience and training to utilize the x-ray to support his testimony. The record also indicates that Hyde used the x-ray to determine the location and angle of the cuts to Harrison's fingers and not for a medical diagnosis. Allowing Hyde to make use of all the information available to him, including the x-ray, was not an abuse of discretion. *See, e.g. Gray v. General Motors Corp.*, 434 F.2d 110, 113 (8th Cir.1970).

### B. *The jury instruction regarding the x-ray*

■ The trial judge permitted the jury to see the preoperative x-ray of Harrison's hand in conjunction with Jack Hyde's testimony. In addition, the trial judge instructed the jury:

... you may conclude to some extent what you think [the x-ray] means.

Now, this x-ray shows some bone. If the witness says something about the bone, and what they mean to him, you will be free to reject it, if it doesn't meet with your approval. You will be able to accept it, if it does.

Trial Tr. at 61, *reprinted in* Appellants' App. at 270.

While case law exists in which courts have found it improper to allow the jury to see x-rays, these cases all involved complex medical issues. *See, e.g. Broderick v. Gibbs*, 1 Mass.App.Ct. 822, 296 N.E.2d 708 (1973). In this case, the jury was permitted to use the x-ray as a photograph would be used, to depict the location and angle of the cuts to Harrison's fingers. Because laypersons are capable of understanding x-rays insofar as they depict the location of a missing section of a bone, it was not improper for the district court to allow the jury to view the x-rays for this purpose.

Further, the challenged jury instruction did not tell the jurors they could use their unbridled discretion in interpreting the x-ray as Appellants suggest. Rather, the

instruction indicated that the jurors could conclude whether they believed the x-ray showed what the witness purported it revealed. For these reasons we find that the admission of the x-ray with the challenged instruction was not an abuse of discretion.

## C. *The scope of Dr. Meagher's testimony*

█ Appellants assert that during the Defendants' opening statement they learned for the first time that Defendants' expert, Jack Hyde, would use the x-ray to support his opinion. The scope of Hyde's expected testimony was reflected in the Defendants' Supplemental Answers to Interrogatories. These interrogatories stated that, "Mr. Hyde will testify that the plaintiff Benjamin Harrison's description of how the accident occurred is inconsistent with the nature and location of his injury and the design of the product." Interrog. of Def. Emerson pp. 7–8, *reprinted in* Appellants' App. at 52–53. Because Appellees did not expressly state that the x-ray would be used until their opening statement to the jury, Appellants assert that they had a right to rebut the interpretation of the x-ray.

Appellants sought to rebut Hyde's anticipated use of the x-ray with the testimony of their medical expert, Dr. Meagher. It was not until a bench conference during the direct examination of Meagher, that Appellants' counsel expressed his intention to ask Meagher for his opinion regarding the significance of the x-ray in determining whether the injury could have been produced by the insertion of fingers into the opening.

Appellees objected to this testimony asserting that it would be unfairly prejudicial because they had been given no notice that Dr. Meagher would testify to anything other than his physical examination of Harrison. Specifically, Appellees objected to Dr. Meagher's testimony as to causation issues because he was never listed as a liability expert in Plaintiffs' Supplemental Answers to Interrogatories.

The scope of Dr. Meagher's expected testimony, as described in the Plaintiffs' Supplemental Answers to Interrogatories and Trial Brief, was limited to his diagnosis and prognosis of the Plaintiff's injuries based on his post-injury examination of the Plaintiff. Appellants' counsel conceded at a bench conference that there was nothing in Meagher's report dated April 13, 1989 which related to the precise manner in which the accident occurred and that, prior to trial, Appellants never intended to have him testify regarding the cause of the accident. Nevertheless, Appellants contend that they had a right to question Dr. Meagher on the causation issue and to solicit his opinion about the significance of the x-ray to "rebut" the expected testimony of Jack Hyde.

During direct examination, the district court initially refused to allow Dr. Meagher to offer an opinion regarding the cause of the Appellant's injury because Appellants had not disclosed that he would so testify prior to trial. The district judge did not address the issue of whether this was proper rebuttal evidence when he excluded the testimony in question. Ultimately, however, as discussed below, the district court allowed Dr. Meagher to testify to some extent about causation, but the court did not allow Dr. Meagher to testify that the x-ray was consistent with Appellants' version of the events.

█ Assuming arguendo that it was error for the trial judge to exclude Meagher's causation testimony, the standard for reviewing a district court's nonconstitutional error in a civil suit requires that we find such error harmless if it is highly probable that the error did not affect the outcome of the case. *See, e.g. United States v. Garcia–Rosa*, 876 F.2d 209, 222 (1st Cir.1989), *vacated on other grounds sub nom. Rivera–Feliciano v. United States*, —— U.S. ——, 111 S.Ct. 377, 112 L.Ed.2d 391 (1990). The record indicates that Dr. Meagher unequivocally testified a number of times that the accident could not have happened in any way other than as Harrison described.[1]

---

**1.** After Dr. Meagher reported his record of the

plaintiff's medical history, which reiterated the

Allowing Dr. Meagher to testify that the x-ray showed an injury which was consistent with Harrison's allegations would have added little to the evidence before the jury. Although Dr. Meagher was prevented from testifying directly about his opinion regarding the accident's cause, he did in fact tell the jury that he believed the cause of the accident could only have been as Harrison described. Any additional testimony by Dr. Meagher regarding causation would have been cumulative. We find that the failure of the trial court to admit such cumulative evidence, as rebuttal or otherwise, was harmless. *Coy v. Simpson Marine Safety Equipment, Inc.*, 787 F.2d 19, 24–25 (1st Cir.1986) (harmless error where substance of excluded testimony could be inferred from other trial testimony).

■ On this appeal, Appellants seem to suggest that Dr. Meagher was prepared to offer a detailed refutation of Hyde's analysis of the x-ray to show in specific terms why Hyde's interpretation of the x-ray was wrong and why the x-ray in fact supported Appellants' theory of causation. If so, it is at least arguable that such testimony could have been properly characterized as "rebuttal" and that it would have been more than merely cumulative. It is impossible to determine, however, whether Dr. Meagher was prepared to give detailed testimony of this nature—or whether he was merely going to state that the x-ray was consistent with Appellants' version of causation—because Appellants never presented the district court with a proffer of the substance of Dr. Meagher's testimony. Federal Rule of Evidence 103(a)(2) places the burden of making a proffer on the proponent of the excluded evidence, precisely in order to resolve this uncertainty and to ensure that the trial judge and the appellate court can evaluate the matter fully. Because Appellants failed to make such a proffer, we conclude that they cannot argue on appeal

that Dr. Meagher was prepared to present a detailed refutation of Hyde's x-ray testimony.

### D. The allowance of the use of negative evidence

■ Hyde was permitted to testify over Appellants' objection that, other than Harrison's, no complaints of similar injuries while using the jointer were ever made to Emerson. Appellants contend this was improper because it was irrelevant, not supported by a proper foundation and misleading because only the name Sears appeared on the jointer.

Although Appellants claim that the negative evidence is irrelevant and inadmissible to prove causation, they offer no authority to support that position and such evidence has been admitted in past cases. *See, e.g., Borrelli v. Top Value Enterprises, Inc.*, 356 Mass. 110, 113, 248 N.E.2d 510 (1969). Since Hyde's testimony was explicitly limited to complaints to Emerson, and because there was evidence that Hyde would know of any complaints regarding the jointers Emerson sold (approximately 390,000), the foundational requirements for such testimony were adequately met.

Appellants' remaining objection to the testimony is based upon their contention that, in fact, customer complaints may have been made to Sears, the retailer, which were not relayed to Emerson and, therefore, Hyde's testimony concerning Emerson was misleading to the jury. Because Appellants were free to cross-examine Hyde about his knowledge of similar complaints (or the lack thereof) made to Sears, their challenge to the admission of this evidence as misleading is not persuasive. Hyde's knowledge of similar complaints made to Sears was not a foundational prerequisite to his testimony regarding complaints to Emerson. For these reasons we find it was not an abuse of discretion

---

plaintiff's contention that he was injured when his hand unintentionally slipped into the opening by the on-off switch, the trial judge asked, "And your *opinion* was that the injury that he received, the damages that he received, was consistent with that history?" Meagher responded, "Absolutely. Absolutely. It couldn't

have happened any other way." The trial judge then repeated his question, "He couldn't have cut himself some other way?" Meagher replied, "No. Absolutely. The middle finger and index were most at risk on the top of the table...." Trial Tr. at 33–34, *reprinted in* Appellants' App. at 171–72.

for the district court to admit this testimony.

### E. *The exclusion of evidence of subsequent remedial measures to negate the expert's qualifications and to impeach Hyde's testimony*

■ The Court did not permit Appellants to question Appellees' expert, Hyde, regarding subsequent remedial measures made to the jointer. Appellants contend that this was reversible error because Appellees bolstered Hyde's qualifications by allowing him to state that he worked on design changes to the jointer. Appellants assert that they should have been able to bring out on cross-examination that one of Hyde's contributions led to the subsequent removal of the opening which allegedly injured Appellant.

Appellants sought to have the evidence of the subsequent removal of the opening in the jointer admitted to impeach Hyde's testimony as well as to diminish his qualifications. Hyde testified on direct examination that, "there [was] no hazardous area left exposed next to the switch where you are going to unintentionally get your hand in there and contact the cutter head." Trial Tr. at 40, *reprinted in* Appellant's App. at 249. However, after Appellants' claim arose, Hyde participated in designing a new jointer without the opening which allegedly injured Harrison.

In rejecting the use of subsequent remedial measure evidence, it is not clear from the record whether the district court was made aware of the impeachment aspect of Appellants' objection. In any event, the use to undercut qualifications and the use to impeach Hyde's testimony are closely related—in substance Appellants wanted to argue that "you can't trust this witness"— and we will assume that both uses were adequately raised before the trial court. In light of the close connection between these two proposed uses, we will refer to both as impeachment.

■ Federal Rule of Evidence 407 does not require the exclusion of evidence of subsequent measures when such evidence is being offered exclusively for impeachment purposes.[2] Reversible error has been found when subsequent remedial evidence has been excluded when offered for impeachment purposes. *See, e.g. Petree v. Victor Fluid Power Inc.*, 887 F.2d 34, 38 (3rd Cir.1989). However, cases which have admitted subsequent remedial measure evidence for impeachment purposes tend to involve a greater nexus between the statement sought to be impeached and the remedial measure than the case at bar. For example, in *Anderson v. Malloy*, subsequent remedial measure evidence was admitted to impeach statements that defendants had checked the area prior to the alleged accident and done *everything possible* to make it safe. 700 F.2d 1208, 1212–14 (8th Cir.1983) (emphasis added). A more direct impeachment use of subsequent remedial measure evidence would exist if Appellees' witness stated that he did not change the product after the alleged accident was brought to his employer's attention. *See, e.g. Garshon v. Aaron*, 330 Ill. App. 540, 71 N.E.2d 799 (1947). Rule 407's impeachment exception must not be used as a subterfuge to prove negligence or culpability. *See Hardy v. Chemetron Corp.*, 870 F.2d 1007, 1010–12 (5th Cir. 1989) (trial court properly excluded evidence of subsequent rewiring proffered to impeach defendant's testimony that negligent wiring had not caused the plaintiff's injury).

The leading commentators have noted the difficulty associated with applying the impeachment exception to Rule 407. Professor Wright voices a strong concern that the "exception" has the capacity to engulf the "rule". 23 Wright & Graham, *Federal Practice and Procedure* § 5289, at 145

---

**2.** Fed.R.Evid. 407 provides:

When after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent [remedial] measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

(1980) (footnote omitted). To guard against the impeachment exception being used as a loophole for bringing in evidence to prove negligence under Rule 407, the commentators advise that trial judges should not abandon their discretionary authority under Federal Rule of Evidence 403 [3] to exclude the use of such evidence. Wright & Graham, *supra*, at 148.

In this case the trial judge invoked his discretionary power to exclude testimony concerning the subsequent design change to the jointer. It is beyond question that the proffered testimony would have been extremely prejudicial to the Appellees. As impeachment evidence the only available basis for admission of the subsequent design change would have been to impeach Hyde's contention that the accident could not have happened in the manner described by Appellant. To allow Appellants to impeach this statement would in effect enable them to impeach Hyde's claim that the product was not defective and that Appellees were not negligent. If the evidence was admitted to impeach Hyde, Appellants' argument to the jury could have closely paralleled an argument that the subsequent measure could be seen as proof that Appellees were negligent.

█ It was within the trial judge's discretion under Rule 403 to determine whether this evidence would have prejudiced Appellees contrary to the intent of Rule 407, and to exclude such evidence due to the risk that the jury might improperly infer negligence from it. *See, e.g., Probus v. K-Mart, Inc.,* 794 F.2d 1207, 1209 (7th Cir. 1986); *Public Service Co. v. Bath Iron Works Corp.,* 773 F.2d 783, 792 (7th Cir. 1985). Because Hyde's statement and qualifications could only have been indirectly impeached by the subsequent remedial measure evidence and because the nature of the evidence was highly prejudicial, the trial judge did not abuse his considerable discretion in excluding such evidence.

For these reasons, the judgment of the district court is *affirmed.*

---

**3.** Fed.R.Evid. 403 provides:
   Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.