

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-18-1997

# Consolidated Coal Co.

Precedential or Non-Precedential:

Docket 96-3434

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Consolidated Coal Co." (1997). *1997 Decisions.* Paper 196.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/196

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

iled August 18, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-3434

COMPLAINT OF CONSOLIDATION COAL COMPANY,
as Owner of the Motor Vessel Elizabeth and as Charterer
of Barge Number MC 1029, for Exoneration From or
Limitation of Liability

GEORGE NEWMAN,

Appellant

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civ. No. 90-01206)

Argued June 27, 1997

BEFORE: GREENBERG and MCKEE, Circuit Judges,
and GREENAWAY,* District Judge

(Filed: August 18, 1997)

Paul L. Hammer (argued)
518 Frick Building
Pittsburgh, PA 15219

 Attorney for Appellant

_____
*Honorable Joseph A. Greenaway, Jr., Judge of the United States
District Court for the District of New Jersey, sitting by designation.

James R. Miller (argued)
Dickie, McCamey & Chilcote
Two PPG Place
Suite 400
Pittsburgh, PA 15222-5402
Attorneys for Appellee

**OPINION OF THE COURT**

GREENBERG, Circuit Judge.

This case is before this court on appeal from the district court's order exonerating the Consolidation Coal Co. ("Consol") from liability for injuries to its employee George Newman. This appeal presents complicated and unusual issues of admiralty procedure. Consequently, we set forth the convoluted procedural and factual history of this case at considerable length.

I. CASE HISTORY

A. Procedural History

On April 27, 1989, Newman was injured while working as a deckhand for Consol. Thereafter, Newman and his wife filed suit against Consol in the Court of Common Pleas of Allegheny County, Pennsylvania, asserting claims of unseaworthiness and negligence under the Jones Act, 46 App. U.S.C. § 688. Subsequently, on July 20, 1990, invoking jurisdiction under 28 U.S.C. § 1333, Consol filed suit in the district court pursuant to the Limitation of Liability Act ("Limitation Act"), 46 App. U.S.C. § 183, seeking exoneration from or limitation of any liability it may have had to the Newmans. As a matter of convenience, we will refer to Consol's case simply as the "limitation action." Pursuant to the Limitation Act, the district court enjoined the state court proceedings. See 46 App. U.S.C. § 185.

After filing his claim in the limitation action (in which he demanded a jury trial), Newman moved on January 18, 1991, to dissolve the stay of the state court proceedings.

2

The district court dissolved the injunction after Newman stipulated:

1. The Claimants waive any claim of res judicata based upon any judgment obtained in the State Court proceeding.

2. Consolidation Coal Company shall have the right to litigate all issues relating to its claim of limitation and exoneration of liability in the present proceeding.
. . .

3. The issue of valuation of the limitation fund shall remain an issue to be resolved by the United States District Court for the Western District of Pennsylvania.
. . .

App. at 132. At the same time, the district court administratively dismissed the limitation action subject to reopening after conclusion of the state court proceedings. Newman entered into this stipulation even though he could have rejected it. He instead could have appealed to this court from the denial of a motion to dissolve the injunction if the district court refused to dissolve the injunction without the stipulation. See 28 U.S.C. § 1292(a)(1).

The case then continued in the state court where in November 1991, Newman (his wife had withdrawn her claims) obtained a verdict finding Consol negligent and the vessel unseaworthy and setting Newman's damages at $1,327,000.[1] With the exception of an issue concerning interest, the Pennsylvania Superior Court affirmed the judgment of the common pleas court; it thus did not disturb any of the jury's factual findings. The Pennsylvania and United States Supreme Courts then respectively denied petitions for allocatur and certiorari.

On June 15, 1995, Newman moved to have the limitation action revived.[2] After the court restored the case, Newman

---

1. The jury also found Newman 11.83% contributorily negligent. The state court molded the verdict to $1,244,519.50 after making certain adjustments we need not detail.

2. The evidence at the trial showed that the tug and barge had a total value of $120,000, far less than the damages Newman recovered in the state court.

filed a motion seeking to have the district court adopt the findings of the state jury, but the district court denied that motion. Newman then appealed that denial to this court and petitioned this court for a writ of mandamus to grant him similar relief. We, however, dismissed the appeal, which clearly was not from a final judgment, and denied the petition for a writ of mandamus. The district court thereafter adopted the jury's assessment of damages. Accordingly, the district court at a bench trial heard the limitation action de novo on liability as well as on certain admiralty issues, which we need not here set forth. The district court found in favor of Consol on liability, rendering the remaining issues moot.

B. Factual History

At the time of his injury, Consol employed Newman as a deckhand. On April 27, 1989, Newman was serving in that capacity on a tug, the M/V Elizabeth, with Timothy Stinson as the pilot. The Elizabeth was being used to move an empty barge, No. 1029, from Consol's repair yard, across the Monongahela river a couple of hundred yards to a fleet of empty barges.

Barge 1029 was about 175 feet long, 26 feet wide and 10 feet deep. Stinson and Newman were inserting Barge 1029 into a row of the empty fleet after removing another barge to the repair yard. Newman was using a rope, or leaving line, to tie Barge 1029 to the adjoining barge at the half-head. Newman already had attached the ends of the barges with wires. Stinson testified that he looked away briefly, and when he turned back, "Mr. Newman was going through the air backwards with a little bit of force . . . ." App. at 1224. Newman has no memory of the accident. Newman fell into the bottom of the barge, hitting his head and severely injuring himself. Stinson said he saw part of the line still attached to the half-head, and part down with Newman. Stinson untied the barge and took it back across to the repair facility to bring Newman to medical aid.

Newman was lifted out of the barge and set on the bank to await an ambulance. Michael Hughes, Consol's assistant operating manager in 1989, retrieved the piece of the line

from the bottom of the barge. Thomas Brown, the foreman at the repair facility, removed the piece of line with the eye from the half-head. Hughes then took possession of the whole line, put it in his office, and later bagged and labeled it. The line was taken to the Pittsburgh Testing Laboratory for analysis by Clarence Clegg. Warren Orr (the port captain), and Louis Truntich (assistant foreman) both testified that they observed the line after the accident and thought it had been cut. Brown stated that the line did not look freshly cut but instead was old and worn. Clegg, Consol's expert witness, testified that the rope had been cut with a sharp instrument, except for a few strands on the outside which could have broken under tension. All the Consol employees who testified stated that the standard practice was for the person using a line to inspect it and replace it if worn out, although Consol did not have a written policy to this effect. New leaving line was available for deckhands needing to replace old line.

On July 18, 1996, the district court entered its decision and order exonerating Consol from liability, finding that there was neither unseaworthiness nor negligence. The court found as a fact that Newman slipped and fell, and that the line was cut through entirely after the accident. This result obviated the need for the district court to decide the limitation of liability issues. Newman then appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

On appeal Newman argues that the district court improperly forced him to stipulate that he would not claim any res judicata effect from the state court judgment; he also challenges as violative of the Seventh Amendment the denial of his motion to adopt the state jury findings. Newman also argues that the district court's factual findings on the exoneration issue were clearly erroneous. He further contends that the court's exclusion, as a subsequent remedial measure, of a Consol safety memo issued about Newman's accident was erroneous as was its denial of a motion he made to dismiss the limitation action by reason of the spoliation of evidence. He predicated the spoliation argument on the contention that if the line was cut after the accident Consol must have cut it.

II. DISCUSSION

A. Standard of Review

This appeal highlights two areas for review. The first arises from the legal consequences flowing from the circumstance that the accident led to both state and federal court proceedings. This area is essentially legal in character. The second area of inquiry focuses on the trial itself. We have plenary review over the district court's legal determinations. Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 102 (3d Cir. 1981). But we must affirm the district court's factual findings unless they are clearly erroneous. Fed. R. Civ. P. 52(a); FMC Corp. v. United States Dep't of Commerce, 29 F.3d 833, 838 (3d Cir. 1994) (in banc).

We review the district court's evidentiary rulings principally on an abuse of discretion standard. Glass v. Philadelphia Elec. Co., 34 F.3d 188, 191 (3d Cir. 1994). We exercise plenary review, however, of its rulings to the extent they are based on a legal interpretation of the Federal Rules of Evidence. Barker v. Deere and Co., 60 F.3d 158, 161 (3d Cir. 1995); Lippay v. Christos, 996 F.2d 1490, 1496 (3d Cir. 1993). We review the court's decision on the motion seeking a dismissal by reason of spoliation of evidence on an abuse of discretion standard. Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 78 (3d Cir. 1994).

B. Background Admiralty Law

The Limitation Act provides that when a maritime accident occurs "without the privity or knowledge of [the] owner," the shipowner's liability "shall not ... exceed the amount or value of the interest of such owner in such vessel, and her freight then pending." 46 App. U.S.C. § 183(a). A shipowner facing potential liability can file a complaint for limitation of liability in a federal district court which then is authorized to stay all other proceedings against the shipowner and receive all claims. 46 App. U.S.C. § 185; Fed. R. Civ. P. Supp. Rule F(4).

Under Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims, the shipowner "may

6

demand exoneration from as well as limitation of liability."
See Texaco v. Williams, 47 F.3d 765, 769 n.19 (5th Cir.
1995). Thus, a complaint under the Limitation Act is a two-
step process. The district court, sitting in admiralty without
a jury, first determines " `whether there was negligence;
[second] if there was negligence, whether it was without the
privity and knowledge of the owner; and [finally] if
limitation is granted, how the [limitation] fund should be
distributed.' " In re Complaint of Dammers & Vanderheide &
Scheepvaart Maats Christina B.V., 836 F.2d 750, 755 (2d
Cir. 1988) (quoting Universal Towing Co. v. Barrale, 595
F.2d 414, 417 (8th Cir. 1979)). The claimant has the initial
burden of showing negligence or unseaworthiness, and
then, if the claimant is successful, the burden shifts to the
shipowner to demonstrate a lack of privity and knowledge
in order to obtain the benefit of limitation of liability.
Bankers Trust Co. v. Bethlehem Steel Corp., 761 F.2d 943,
948 n.14 (3d Cir. 1985).

The exclusive admiralty jurisdiction of the federal courts
in Limitation Act actions directly conflicts with the "saving
to suitors" clause of 28 U.S.C. § 1333, which preserves
common law rights in certain maritime cases, including the
right to a jury trial. See Gorman v. Cerasia, 2 F.3d 519, 524
(3d Cir. 1993). There is a conflict because "[t]here is no
right to a jury in actions instituted in admiralty, and the
claimants are enjoined from pursuing common law actions
in other forums." Dammers, 836 F.2d at 755 (citation
omitted). The conflict derives from the Seventh Amendment,
as the Amendment applies only to cases brought at
common law, not those brought in admiralty. Waring v.
Clarke, 46 U.S. (5 How.) 441, 458-60 (1847).

There are two exceptions to this exclusive admiralty
jurisdiction over Limitation Act proceedings. Thefirst arises
when the value of the vessel and its freight exceeds that of
all claims, that is the fund is adequate to cover all claims
filed against the owner. See Lake Tankers Corp. v. Henn,
354 U.S. 147, 152, 77 S.Ct. 1269, 1272 (1957); Gorman, 2
F.3d at 524. The second exception arises when there is only
one claimant whose claim exceeds the value of the vessel
and its freight.3 In this case, because the second exception

_____

3. If a single claimant's claim is for less than the value of the vessel and
its freight, a limitation proceeding is not needed.

applied, the district court was obliged to dissolve the stay against other proceedings if Newman stipulated to the district court's exclusive jurisdiction to determine all issues relating to limitation of liability. See, e.g., Ex parte Green, 286 U.S. 437, 438–40, 52 S.Ct. 602, 602–03 (1932); Langnes v. Green, 282 U.S. 531, 540–44, 51 S.Ct. 243, 246–48 (1931); Gorman, 2 F.3d at 524. These stipulations must waive any claim of res judicata based on the state court judgment and concede the shipowner's right to litigate all limitation issues in federal court. Id. at 524–25; see also, Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty § 10–19, at 871 (2d ed. 1975). 4

C. Stipulations and Trial de novo

Newman argues that the district court erred in denying his motion to adopt the factual findings of the state court jury on the liability issues and in trying the exoneration and limitation issues de novo. However, the case law is clear that in a single claimant/inadequate fund situation like this, the claimant is entitled to proceed in state court after making the appropriate stipulations. See , e.g., Langnes, 282 U.S. at 540–44, 51 S.Ct. at 247–48; Gorman, 2 F.3d at 524. The requirement that the claimant waive any claim of res judicata from a state court judgment and concede the shipowner's right to litigate all limitation issues in federal court "has been accepted by federal courts for over half a century and is now beyond dispute." Id. at 524–25. Any factual findings by the state court jury thus will not bind the federal court in determining the shipowner's right to limitation. Id. at 528–29. The Seventh Amendment is inapplicable in such a situation because thefinding on the owner's privity and knowledge, which is critical on the limitation issue, is separate from the liability determination made by the state court.

---

4. In this opinion, we use the terms "res judicata" and "collateral estoppel" rather than "claim" or "issue" "preclusion" because the stipulation in the district court leading to the dissolution of the injunction against the state court proceedings was that Newman "waive[d] any claim of res judicata based upon any judgment obtained in the State Court proceeding."

The law is less clear on whether a shipowner has the right to litigate the issue of exoneration in federal court without regard to the findings in the state court, as the exoneration issue mirrors the liability determination that the state court makes. The Court of Appeals for the Seventh Circuit recently held in an exoneration and limitation of liability action that the liability issue should be determined in state court and the case should return to the federal court only to decide limitation issues if the claimant wins a judgment in excess of the limitation fund. In re Complaint of McCarthy Bros. Co./Clark Bridge, 83 F.3d 821, 828 (7th Cir.), cert. denied, 117 S.Ct. 361 (1996). The Court of Appeals for the Fifth Circuit, however, has held that notwithstanding the inherent redundancy in having overlapping state and federal court proceedings, claimant stipulations can protect both "the shipowner's right to limit liability and [to] litigate the issue of exoneration in federal court. . . ." Texaco v. Williams, 47 F.3d at 769. See also Odeco Oil and Gas Co. v. Bonnette, 4 F.3d 401, 405 (5th Cir. 1993) (When "the claimants are so anxious to take advantage of the perceived magnanimity of South Texas juries that they are willing to stipulate essentially that they will submit to two trials -- the state court trial followed by a substantially redundant federal limitation proceeding -- this court is hard put to deny them.").

In this case it is not necessary for us to take a position on how far a claimant's stipulations must go. In other words, we need not decide whether a district court, as a condition of dissolving the injunction against the state court proceedings, may insist that the claimant waive the res judicata effect of the state court finding on the liability issue because Newman has not preserved his right to raise this issue. Here, in the same manner as the claimants in Texaco v. Williams, Newman agreed by stipulation to waive any claim of res judicata regarding issues of both limitation and exoneration. Although the district court required Newman's stipulation as a condition of dissolving the injunction against the continuation of the state court proceedings, Newman could have refused to enter into the stipulation and then appealed the court's refusal to dissolve the injunction without the stipulation. 28 U.S.C. § 1292(a)(1) ("the courts of appeals shall have jurisdiction of

appeals from: (1) Interlocutory orders . . . refusing to dissolve or modify an injunction. . . ."); see also Gorman, 2 F.3d at 523.5 Because Newman did not take such an appeal, or even object to the form of the stipulations in the district court, we will not review the issue, see Dillinger v. Caterpillar, 959 F.2d 430, 447 (3d Cir. 1992), and Newman is now bound by the stipulations he made and cannot argue that the district court required them improperly.6 We therefore need not decide whether a claimant in a limitation action must waive the res judicata effect of the state court proceedings as to both limitation and exoneration issues in order to proceed in state court under the saving to suitors clause. We do indicate, however, that we have serious doubts that the claimant must do so; thus the district courts should not read this opinion as approving implicitly a requirement that the stipulation waiving the res judicata effect of the state court action include liability issues.

D. Jury Trial and the Seventh Amendment

Newman argues further that even if retrial of the exoneration issue in the federal court was appropriate, it should have been before a jury. Newman's problem here is that while Congress can provide for jury trials in admiralty cases, as it has done under the Jones Act, the Seventh Amendment does not provide a right to a jury trial in admiralty. Fitzgerald v. United States Lines Co., 374 U.S. 16, 20, 83 S.Ct. 1646, 1650 (1963). While an admiralty claim may be heard by a jury when it is joined with a claim for which there is a right to a jury trial, id., Newman did not bring his Jones Act and unseaworthiness claims in federal court where he might have been able to obtain a

---

5. Newman's attorney conceded at oral argument that under Fifth Circuit case law he could have filed such an appeal, but contended that he could not in the Third Circuit. We find unpersuasive his argument that the plain language of section 1291(a)(1) differs depending on which circuit you are in.

6. In addition, judicial estoppel would apply in this case. The district court dissolved the injunction based on Newman's stipulations. Newman cannot change position now and argue that those stipulations are not binding upon him. See Murray v. Silberstein, 882 F.2d 61, 66 (3d Cir. 1989).

10

jury trial on the claims relating to exoneration. 7 <u>See Simko v. C & C Marine Maintenance Co.</u>, 594 F.2d 960, 965 (3d Cir. 1979); <u>Red Star Towing & Trans. Co. v. Ming Giant</u>, 552 F. Supp. 367, 371 (S.D.N.Y. 1982). Instead, Newman brought his Jones Act and unseaworthiness claims in state court, and later entered into stipulations to stay Consol's exoneration/limitation action and return to state court where he won a jury verdict. Thus, the case in the district court was entirely an admiralty case which did not include a right to a trial by jury. <u>See Cooper v. Loper</u>, 923 F.2d 1045, 1048 (3d Cir. 1991). We are not aware of any authority holding that a nonjury admiralty claim must be tried to a jury when it is not joined with another claim which carries a right to a jury trial.

Newman seems to think that the district court retried his Jones Act and unseaworthiness claims. That belief is not correct. Those claims were tried in the state court. The district court tried only the limitation/exoneration action, an admiralty case for which there is no right to a jury trial. As we indicated in <u>Gorman</u>, 2 F.3d at 524, a proceeding under the Limitation Act is heard by a court sitting in admiralty without a jury. We will not allow a claimant in a limitation action to obtain consecutive jury trials in the state and federal courts through the device of characterizing his claim in the limitation action as being predicated on the Jones Act or unseaworthiness. Thus, no matter how Newman characterizes his claim in the limitation action, his claim was a part of that action. <u>See In re McCarthy Bros. Co.</u>, 83 F.3d at 826 ("Claimants have no right to a jury in admiralty actions, and thus lose their right to pursue common law remedies before a jury when forced into admiralty court under the Limitation Act.") (citation omitted).

In trying the admiralty action, the district court considered independently issues decided earlier by the state court jury, but reached a different result. Yet the inconsistency was entirely appropriate because Newman waived any claim to res judicata based on the state court

---

7. We, of course, do not rule that he could have obtained a jury trial in these circumstances as the situation we describe is not before us.

11

proceeding with respect to exoneration. We emphasize that we are not concerned here with a situation in which a claimant brings his Jones Act and unseaworthiness claims in a district court and then the shipowner brings a limitation action.

Newman argues that by trying the exoneration issue de novo, the district judge was re-examining the facts found by the state court jury contrary to the Seventh Amendment. But the cases Newman cites on this point all involved situations where the trial or appellate court rejected or modified a jury's factual finding in the same case. Here, the jury findings were in a different forum. Normally, res judicata or collateral estoppel would apply in such circumstances because both the state claims and the exoneration/limitation action arose from the same set of events. Here, however, Newman explicitly waived any right to res judicata on the limitation and exoneration issues.8 Thus, the Seventh Amendment did not forbid the independent examination in the admiralty case of the issues previously adjudicated in the state court case. Newman received a jury trial for those claims in the forum in which he was entitled to one.

Adopting the facts found by the state court jury would mean that the state court proceedings had res judicata application on the exoneration issue and would eliminate Consol's right to litigate the exoneration issue in the district court. Such an application would be directly contrary to Newman's stipulation in the district court to Consol's right to litigate in the district court all issues relating to both exoneration and limitation. The district court did adopt the jury's findings on damages because the damages issue was not covered by Newman's waiver of res judicata. Thus, the state court trial was not a "complete nullity" as Newman now claims. Newman may consider his efforts in state court to have been a waste of time, given the final result, but he was the party who sought to be in state court, and as he entered into the stipulations which have led to this result, he must live with their consequences.

---

8. This court in Gorman held that the term "res judicata" in a limitation action stipulation also encompasses the doctrine of issue preclusion. 2 F.3d at 528-29.

12

E. District Court Factual Findings

We turn now to the second area of inquiry on appeal, the area relating to the trial itself. Newman argues that the district court's factual findings in support of its decision to exonerate Consol from liability were clearly erroneous in several respects. First, he contends that Consol did not disclose in pretrial proceedings that it was claiming that the leaving line Newman used was cut after the accident. The evidence Newman has for this contention is one response from Consol's attorney at a pretrial conference. After Newman's attorney asked if the legal theory of the case was that the rope was cut after the accident, Consol's attorney said: "No, I don't believe that is the theory." App. at 1110. Newman does not mention, however, that the court responded first to Newman's attorney's inquiry by saying: "Well, that has been mentioned as one of the, certainly one of the theories. I don't know that that's, that is the, the theory." Id. Then, after Consol's attorney responded, the court said: "But they certainly have, I've seen it in their pretrial report, mentioned there." In the circumstances, Consol's attorney's statement easily can be seen as a response to the court that it was not the only theory, although it was a possible theory.

This conclusion is consistent with Consol's earlier statements on the matter. Consol argued in its pretrial statements that the rope was cut, but it did not know when it was cut, and if it had been cut before the accident Newman should have seen it and replaced the rope. App. at 88-89, 1086 ("It is presently unknown precisely when the rope in question was cut, or by whom it was cut, except that it was cut prior to being brought to Consolidation's marine ways landing after the alleged accident."). These statements are consistent with the court's factualfinding that Consol cannot be deemed to have waived or disclaimed the issue.

Newman also argues that there is no evidence to support the court's finding that Newman slipped. Newman has no memory of the accident, and Stinson, the only witness, was looking away when Newman began to fall and only turned back when Newman already was falling backwards. Thus, Newman is correct that there is no direct evidence that

13

Newman slipped, nor could there be. The district court apparently inferred that Newman slipped after the court first found that the rope did not break, but was cut after the accident. We cannot find these factual findings clearly erroneous because there is clear support for them in the record.

Clegg, the expert witness, testified that the rope had been

cut almost entirely through except for a few yarns (of 156 total yarns in the rope) on the outside of the rope which broke under tension. Newman appears to argue that the line was cut before the accident, but remained at least partly attached until Newman pulled on it so that it was the breaking of the remaining intact yarns that caused him to fall. This theory is consistent with the facts, but so is the one reached by the district court, that the rope was cut through after the accident. This conclusion is particularly plausible, because it would be fairly obvious if a rope was held together by only a few of 156 yarns, and Newman testified that he would have replaced bad line had he noticed it. We do not decide which version of the facts we find more probable. The district court decided that the rope was cut after the accident and we cannot say that this finding was clearly erroneous.

Given the finding that the rope did not break, but was cut, a permissible if not a necessary inference to be drawn is that Newman slipped. He was walking along a 2-3 foot gunnel on the barge with large drop-offs on either side, a situation which presents a severe slipping hazard. We cannot find clear error in the conclusion that he fell in these circumstances.

If the rope did not break, and was cut after the accident, then it was not defective. Newman's theory of liability for his unseaworthiness and negligence claims was that Consol provided defective rope. Newman offered no other evidence of Consol's negligence or the unseaworthiness of the tug and the barge. Inasmuch as the court found that the rope was not defective, and we affirm the factual findings supporting this conclusion, the legal finding that there was neither negligence nor unseaworthiness also must be affirmed.

14

F. Evidentiary Rulings

Newman also challenges certain evidentiary rulings by
the district court. Newman attempted to introduce a Consol
safety memo regarding the accident. The memo, prepared
May 2, 1989 (five days after the accident) by David
Kreutzer, stated that an employee fell after a leaving line
broke and cautioned all employees to inspect ropes
carefully before using them. Consol objected that this
memo was a subsequent remedial measure and thus
inadmissible under Fed. R. Evid. 407, and the court agreed.
While the dissent argues that the memo is not a
subsequent remedial measure within the meaning of Rule
407 because Newman only sought to admit the portion
dealing with Consol's investigation of the accident, dissent
at 19, there is authority supporting the exclusion of
evidence of post-accident investigations under Rule 407.
See Specht v. Jensen, 863 F.2d 700, 701-02 (10th Cir.
1988) (upholding exclusion of press release detailing city
investigation of incident and response to problem
discovered);9; Alimenta v. Stauffer, 598 F. Supp. 934, 940
(N.D. Ga. 1984) (excluding post-incident report and
recommendations for improvement). Furthermore, Newman
argues that the memo should have been admitted under an
exception to Rule 407, as he contends that he offered the
memo only to impeach the testimony of Truntich that the
line looked like it had been cut with an ax. Thus, the
district court properly considered the memo within the
framework of Rule 407.

---

9. The dissent relies on Rocky Mountain Helicopter v. Bell Helicopter, 805
F.2d 907 (10th Cir. 1996), for the proposition that post-event "tests or
reports" are not within the ambit of Rule 407. See dissent at 19-20 n.3.
Rocky Mountain dealt with tests and reports designed specifically to
determine the nature of a problem, though, while the memo in question
here was a "safety alert," app. at 1279. This "safety alert" was designed
to alert Consol employees to a potential danger, worn lines, and advise
them of measures to avoid this danger, closer inspection. This is
inherently a subsequent remedial measure designed to prevent future
accidents rather than an investigation or test "conducted for the purpose
of . . . discover[ing] what might have gone wrong or right." Rocky
Mountain, 805 F.2d at 918. Thus, Specht is more relevant to this case
than Rocky Mountain.

15

It can be reversible error to exclude evidence of a subsequent remedial measure when it is offered entirely for impeachment purposes. Petree v. Victor Fluid Power, Inc., 887 F.2d 34, 38 (3d Cir. 1989). Yet a court must interpret the impeachment exception to Rule 407 circumspectly because "any evidence of subsequent remedial measures might be thought to contradict and so in a sense impeach [a party's] testimony. . . ." Flaminio v. Honda Motor Co., 733 F.2d 463, 468 (7th Cir. 1984) (emphasis added). Accordingly, the evidence offered for impeachment must contradict the witness's testimony directly. See Kelly v. Crown Equip. Co., 970 F.2d 1273, 1278 (3d Cir. 1992). Here, Truntich testified that the line appeared to him to have been cut by an ax. The Kreutzer memo described an accident where a line broke, presumably Newman's although no names were mentioned. But the memo does not directly contradict Truntich's testimony. Truntich only was offering his opinion of the appearance of the line immediately following the accident. As the Court of Appeals for the First Circuit has held, there must be "a greater nexus between the statement sought to be impeached and the remedial measure than the case at bar." Harrison v. Sears, Roebuck & Co., 981 F.2d 25, 31 (1st Cir. 1992). The district court thus correctly interpreted Rule 407 and did not err in excluding the evidence.

It is also important to point out that, as we observed above, there was evidence that the line was not cut after the accident. Thus, when Kreutzer wrote his memo, it was entirely natural for Consol to give the warning it did. After all, it surely was appropriate to tell employees to inspect ropes before using them.

Furthermore, the memo recited that it was based on Consol's "investigation." Thomas Brown testified that the line did not look freshly cut, but obviously the district court rejected that evidence at the trial. In the circumstances, it is hardly conceivable that the introduction of the memo at trial could have altered the outcome of the bench trial in this case. While the dissent suggests that the memo would have corroborated Brown's testimony, we do not see how it could have added any further corroboration to the evidence at the trial in the absence of a showing that the

16

"investigation" which led to Kreutzer sending the memo led to information not available at trial. As far as we are aware, Newman did not make any such showing. Certainly his brief does not say he did.

The second evidentiary ruling that Newman challenges is the denial of his motion to dismiss this limitation action for spoliation of evidence. Newman argues that the denial of this motion is inconsistent with the court's factual finding that the rope was cut after the accident because if it was cut, Consol must have cut the rope and prevented Newman from examining it in one piece, or substituted a cut rope for the rope that broke. But the court's rulings are not contradictory. Consol employees testified that they retrieved the two pieces of the line once the barge was brought back to the repair facility and showed a chain of custody from that point forward. Stinson testified that he saw the line in two pieces after Newman fell and that he did not cut the line. Stinson admitted that there were cutting tools on the tug and that he handled the rope in removing Barge 1029 from the empty fleet to take Newman to medical attention. The district court, faced with this testimony, could have discredited Stinson's contention that he did not cut the line and inferred that he did. There is absolutely no evidence that Consol substituted the cut line for a broken line, and Newman's argument that Consol cut the line is inconsistent with his theory that the line broke. Thus, there was no compelling reason for the court to find that Consol destroyed any evidence. In the circumstances, the court surely did not abuse its discretion in denying Newman's motion to dismiss on spoliation grounds.

III. CONCLUSION

The order of the district court entered July 18, 1996, exonerating Consol from liability will be affirmed. Therefore, we need not consider Newman's arguments that Consol had privity and knowledge and thus is not entitled to limitation of liability.

17

McKEE, Circuit Judge, dissenting in part and concurring in part.

I must respectfully dissent from part II.F. of the majority opinion. Although I concur with the rest of the majority's analysis, I believe that the district court erred in excluding the Kreutzer memorandum under Rule 407 of the Federal Rules of Evidence. Moreover, I do not believe that this error was harmless, and I would therefore remand for further proceedings.

The condition of the rope or "leaving line" was crucial to the determination of Consolidation Coal's liability. Those lines are used to tie barges together and can, in good condition, withstand a force of over 18,000 pounds. The district court concluded that the leaving line Newman was holding when he fell had been cut. Clearly, if that line was cut after plaintiff fell, as the district court concluded, Consolidation Coal would not be liable. However, if before the fall, the line had been cut or was in defective condition, Consolidation may well be liable. See Earles v. Union Barge Line Corp., 486 F.2d 1097, 1104 (3d Cir. 1973) (A shipowner has a duty "to furnish a reasonably safe place for . . . one working aboard the barge to perform his chores . . . [The breach of that duty] results in liability for negligence when the breach proximately causes injury to a foreseeable person."). "[A] shipowner's duty to furnish a seaworthy ship is absolute and completely independent of his duty . . . to exercise reasonable care . . . ." Id. at 1105 (internal quotations omitted); see also Edynak v. Atlantic Shipping, Inc., 562 F.2d 215, 222 (3d Cir. 1977).

Louie Truntich, the assistant foreman at the time of the accident, testified that he saw the leaving line on the day of the accident after Newman's fall, and it appeared to have been "cut with an axe. . . . It was just a nice, smooth, straight cut." App. at 1271a. Newman sought to discredit this testimony by introducing a memo circulatedfive days after his accident by David Kreutzer, the top company official on the scene the day of the accident. That memorandum stated in part:

 Our investigation showed that the line had suffered prior damage and although it was the normal 1-1/2

18

[inch] MPO leaving line typically used for this purpose, <u>a close inspection should have pointed out the damage and the line should have been taken out of service</u> .

App. at 1279a (emphasis added).[1] The district court excluded this evidence under Rule 407 of the Federal Rules of Evidence as a subsequent remedial measure presumably because the memo goes on to announce that, in the future, "careful examination of the rigging and lines shall be made prior to their use in any operation." App. at 1279a. Rule 407 states:

When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence . . . . This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as . . . impeachment.

Fed. R. Evid. 407. Certainly, if Newman sought to admit the memo's language about examining the lines, then Rule 407 would be implicated. The record clearly reflects, however, that Newman only sought to admit that portion related to the company's investigation into his accident.[2] I do not believe that this proffered evidence was within the scope of Rule 407. Therefore, I would remand this case to the district court for a determination of whether that evidence could have been excluded on other grounds or whether it should have been admitted.

Even if the memo's statement about the company's investigation into Newman's accident is a subsequent remedial measure,[3] the district court should have

_____

1. Although the memo does not specifically mention Newman's name, it is clear from its content and date that it is referring to his fall.

2. The memo could have been redacted to exclude the language regarding the "subsequent remedial measure."

3. Arguably, the last few lines of the above excerpt suggest remedial action that would fall within the scope of Rule 407: "[A] <u>close inspection should have pointed out the damage</u> and the line should have been taken out of service." App. at 1279a (emphasis added). However, that inference is tenuous at best.

19

determined whether it was nevertheless admissible under Rule 407 as impeachment evidence.4 If, as the memo suggests, the condition of the rope was such that "a close inspection" would have disclosed that the line should not have been used, the district court could have rejected Truntich's testimony that the rope appeared to have been "cut with an axe" and concluded that it was not "just a

_____

The majority suggests that Kreutzer's memo was unambiguously within the scope of Rule 407 and further contends that "there is authority supporting the exclusion of evidence of post-accident investigations under Rule 407." Majority Op. at 15. In support of its position, the majority cites Specht v. Jensen, 863 F.2d 700, 701-02 (10th Cir. 1988) and Alimenta v. Stauffer, 598 F. Supp. 934, 940 (N.D. Ga. 1984). Both cases involved an attempt by one party to admit a document specifically for the subsequent remedial measures it contained. As I explained above, that is not the case here; Newman clearly only wanted to admit the findings from Consolidation's investigation, namely, "that the line had suffered prior damage," not the company's response thereto.

This distinction is explained in the Tenth Circuit's opinion in Rocky Mountain Helicopters v. Bell Helicopters, 805 F.2d 907 (10th Cir. 1986), cited in Specht, 863 F.2d at 702.

It would strain the spirit of the remedial measure prohibition in Rule 407 to extend its shield to evidence contained in post-event tests or reports. It might be possible in rare situations to characterize such reports as "measures" which, if conducted previously, would reduce the likelihood of the occurrence. Yet it is usually sounder to recognize that such tests are conducted for the purpose of investigating the occurrence to discover what might have gone wrong or right. Remedial measures are those actions taken to remedy any flaws or failures indicated by the test. In this case, the remedial measure was not the Photoelastic Study of the trunnion but rather the subsequent redesign of the trunnion.

Rocky Mountain, 805 F.2d at 918. In Rocky Mountain, all references to the redesign were excluded at trial, see id., which is what I suggest could have been done with respect to the Kreutzer memo's references to Consolidation's post-accident implementation of an inspection policy.

4. If Truntich was an agent of the company, then his statement about the rope's condition could be impeached by the statement in the company memo. I take no position as to whether the record supports the conclusion that Truntich was testifying as an agent of Consolidation Coal, however.

20

nice, smooth, straight cut" as Truntich testified. At the very least, the memorandum would have corroborated the testimony of Thomas Brown, the foreman at the repair facility. Brown testified that the rope did not look freshly cut.

The majority suggests that the memorandum did not directly contradict Truntich's testimony and cites <u>Harrison v. Sears, Roebuck & Co.</u>, 981 F.2d 25, 31 (1st Cir. 1992), in support of its statement that "Truntich only was offering his opinion of the appearance of the line immediately following the accident. . . . [T]here must be `a greater nexus between the statement sought to be impeached and the remedial measure than the case at bar.' " Majority Op. at 16. However, the appearance of the rope immediately following the fall was crucial evidence. Indeed, I can think of no other basis for the district court's conclusion that the rope had been cut after the fall than how the rope appeared immediately afterwards.

In <u>Kenny v. Southeastern Pennsylvania Transportation Authority</u>, 581 F.2d 351 (3d Cir. 1978), we allowed evidence of new lighting fixtures that were installed on a train platform after an assault there to impeach the testimony of a SEPTA employee that platform lights were inspected daily. In <u>Petree v. Victor Fluid Power, Inc.</u>, 887 F.2d 34 (3d Cir. 1989), we ruled that the district court committed reversible error in refusing to admit evidence of a warning decal that had been applied years after plaintiff 's injury when that evidence was offered to impeach testimony that a mechanical press had no inherent dangers. I believe Kreutzer's memo could have been admitted for similar purposes.

Moreover, it is important to bear in mind that the exoneration/limitation proceeding was a bench trial so the court's usual concern that the jury will misuse the impeachment evidence is absent. Accordingly, the majority is far more concerned about the dangers of admitting evidence of a "remedial action" than is warranted by the circumstances of this case. <u>See</u> majority op. at 16 (quoting <u>Flaminio v. Honda Motor Co.</u>, 733 F.2d 463, 468 (7th Cir. 1984)(suggesting that "<u>any</u> evidence of subsequent remedial measures might be thought to . . . impeach")).

21

"The reason for the exclusion [of remedial measures after an accident] is to encourage post-accident repairs or safety precautions in the interest of public safety." <u>Kenny</u>, 518 F.2d at 351. That public policy is not furthered by excluding the language in Kreutzer's memo that simply described the condition of the rope and stated that the leaving line "had suffered prior damage." App. at 1279a.

Although the district court could have rejected this evidence and accepted Truntich's testimony, I believe that testimony was so crucial that Newman is entitled to have the district court reconsider the admissibility of this evidence. If the court determines that there is no other obstacle to receiving that memo into evidence, then the court should reexamine the question of Consolidation's liability in light of this additional evidence. Accordingly, I respectfully dissent from section II.F. of the majority opinion.

A True Copy:
Teste:

<u>Clerk of the United States Court of Appeals
for the Third Circuit</u>

22